## MISSISSIPPI RIVER LOGGING CO. v. SCHNEIDER.

(Circuit Court of Appeals, Seventh Circuit.   May 4, 1896.)

### No. 238.

1. MASTER AND SERVANT—SERVANT'S ASSUMPTION OF RISK.

While it is the duty of a master to provide a reasonably safe place in which his servant may perform his work, yet he may conduct his business in the way that seems to him best, although less hazardous methods might be employed; and in such case, if the servant knows and comprehends or is reasonably warned of the dangers, he assumes the risk of the more hazardous method. A servant of mature age and of experience is charged by the law with knowledge of obvious dangers, and of those things which are within common observation, and according to natural law, and in such cases the master need not give warning of possible danger of which both parties had equal knowledge.

2. SAME.

It is not necessary that a servant should be warned of every possible manner in which injury may occur to him, nor of risks that are as obvious to him as to the master; and where a mature and experienced man engages in a dangerous occupation, with the risks of which he is familiar, and is injured, not through defect in the appliances, but through the manner of their operation, incident to the business, he cannot recover against the master.

3. SAME—MEASURE OF MASTER'S DUTY—OPINION OF EXPERTS.

The question of the negligence of a master in failing to provide proper instruments for the use of his servants and safeguards against danger cannot be submitted to a jury upon opinions of experts as to what ought to have been provided, without showing that some such safeguards are usually and customarily employed by those engaged in similar business; for jurors are not at liberty to charge a duty upon a master, according to their own notions of what is proper, nor upon the opinion of experts, but should determine the question of dereliction of duty by the customary observance of those in like business.

In Error to the Circuit Court of the United States for the Western District of Wisconsin.

This suit was to recover damages sustained by Lawrence Schneider, the defendant in error, on the 27th day of September, 1892, while in the service

of the Mississippi River Logging Company, the plaintiff in error, alleged to have occurred through negligence and failure of duty on the part of the master. The plaintiff in error operated a band-saw mill in the city of Eau Claire, which extended in an easterly direction on the north bank of the Eau Claire river, and fronted to the east. At the easterly end of the mill, and on its north side, was a carriage 20 feet in length, operated by steam, upon which logs were placed, and thereupon carried to a band saw located 24 feet from the easterly end of the mill, and by which the logs were sawed into lumber. Immediately west of the band saw was a line of live rollers some 40 feet in length, each roller being some 30 inches long, which moved so that the lumber was carried over them at the rate of 250 feet per minute. In direct line therewith, and extending in a westerly direction through the mill for 68 feet, was a set of dead rollers. Between the line of live rollers and the line of dead rollers was an open space or alley of the width of 3 feet. Directly south of the line of dead rollers, and parallel therewith, was an edger table 20 feet in length and the edger, the easterly end of which was 8 feet west of the easterly end of the set of dead rollers. This edger was used to trim the rough edges of the boards cut from the logs by the band saw and fashion the boards to the required widths. Directly north of the dead rollers, and parallel therewith, was a second set of dead rollers, and at a point thereon 22 feet west of the alley and 6 feet west of the westerly end of the edger was a slab saw or jump saw from 25 to 28 inches in diameter, revolving from the south, when in use, at a velocity of from 8,000 to 10,000 feet per minute. When not in use, the saw drops below the surface through a slot in the table. When raised above the table and in use, the southerly side of the saw extends nearly to the first set of dead rollers, so that if a plank passing down the live rollers upon the set of dead rollers first described was pushed or swerved from its course, and with a force sufficient to carry it 22 feet upon the dead rollers, it might come in contact with the teeth of the slab saw if in use at the time, and be thrown, by the force of the revolving saw, in the direction of the person operating the saw. The raising or lowering of the slab saw was controlled by means of a hand lever by the person operating the saw. Upon releasing the lever the saw immediately drops below the rollers and the table by force of gravity. The mode of operation with the slab saw was this: The slabs were placed over the slot on the table, and the saw raised by means of the lever. When the slab was cut, the saw dropped below the table. North of this slab saw and the set of dead rollers was a platform from which the slabs when cut were carted away. The manner of operating the mill was this: Logs were placed upon the carriage and served to the band saw. At the rear or west side of the band saw was stationed the tail sawyer, whose duty it was to start each piece of lumber cut from the log by the band saw along the live rollers toward the westerly end of the mill. At the easterly edge of the edger table was stationed the edger man, whose duty it was to receive the boards as they came from the rollers, remove them therefrom, and run them upon the edger table, and through the edger. Up to the time in question the slab saw was operated by one Larson, employed for that special purpose. The defendant in error, at the time of the injury, was some 30 years of age. He had been employed in the mill in question from April, 1892,—some five months. Prior thereto he had worked in sawmills in the city of Eau Claire for six summer seasons, and during one summer he worked within 15 feet of an edger in the mill in which were used two circular saws. He was familiar with circular saws, band saws, and rotary saws, and their operation, and stated that he knew "what pretty near every piece of machinery in that mill is for," but until the date of this injury he had never, as he stated, worked on this slab saw, or upon any other machinery of like nature. He stated that men were frequently hurt in sawmills; that "lively men got hurt; was danger where I was working." He further stated that if anything hit the saw it would be thrown by the force of the saw, and in the direction of its revolution. For the four months prior to the injury he had worked in the lath mill pulling lath as they came from the saws, and counting them as they came through. In this lath mill there were four or six saws in operation. He said that on the day of the injury the superintendent directed him

to go upstairs and clean the elevator, and went along with him; that when he had cleaned the elevator the superintendent took him to the other side of the elevator, and told him to go and cut slabs, but afterwards stated that the expression was, "Go help the man with the slabs," or "Go help the man cutting slabs;" at the time he found Larson engaged in pulling slabs from behind the saw so as to get rid of the pile in the alley; that when he arrived there Larson was sawing, and that he watched him; that Larson quitted sawing, and went behind the saw with the hook to get slabs. While Schneider was engaged in running the slab saw, the operator, whose duty it was to take the lumber from the live rollers and put it through the edger, did not or could not remove the boards fast enough, so that one board coming over the live rollers shoved the board that was ahead of it and was upon the dead rollers, and, either by the manner in which it was struck or by the act of the operator in endeavoring to secure it, the board was turned somewhat from its ordinary course, and was shoved forward upon the dead rollers and was carried against the saw, was caught upon the saw, and hurled against Schneider, inflicting the injuries complained of. The superintendent stated that to the best of his knowledge he did not tell Schneider to saw slabs at that saw, and Larson, the operator of the saw, did not see the superintendent there with Schneider, and states that Schneider commenced sawing while the witness was engaged in picking up some slabs, drawing them along the dead rollers, and that he did not direct, nor to his knowledge did any one direct, Schneider to work at the saw. At the close of the evidence the defendant below requested the court to instruct the jury to render a verdict for the defendant, which request was denied, and the defendant seasonably excepted. There was a verdict and judgment in favor of the plaintiff below, to review which this writ of error is sued out.

V. W. James and Wm. G. Challis, for plaintiff in error.

T. F. Frawley, for defendant in error.

Before WOODS, JENKINS, and SHOWALTER, Circuit Judges.

JENKINS, Circuit Judge, after this statement of the case, delivered the opinion of the court.

In considering whether the trial court correctly refused to direct a verdict for the defendant, we are obliged to view the evidence in the light that is most favorable to the defendant in error. We must, therefore, assume that he was directed temporarily to perform a service outside of his usual employment, and one for which he had not engaged; although it is not clear from the pleadings or from the evidence that such was the fact. The question arises with respect to the liability of a master in such case. In Reed v. Stockmeyer (herewith decided) 74 Fed. 186, we had occasion to assert some of the principles governing the relation of master and servant, and there declared that, while it is the duty of the master to provide a reasonably safe place in which the servant may perform his work, yet that he may conduct his business in the way that seems to him best, although less hazardous methods might be employed; and in such case, if the servant knows and comprehends the dangers, or is seasonably warned of them, he assumes the risk of the more hazardous method. The servant of mature age and of experience is charged by the law with knowledge of obvious dangers, and of those things that are within common observation and are according to natural law. In such case the master need not give warning of possible danger of which both parties had equal knowledge. In addition to the authorities cited in that case we add the following: Kelly v. Abbot, 63 Wis. 309, 23 N. W. 890; Railway Co. v. Love, 10 Ind. 556;

Hayden v. Manufacturing Co., 29 Conn. 548; Railroad Co. v. Minnick, 23 U. S. App. 310, 316, 10 C. C. A. 1, and 61 Fed. 635; Railroad Co. v. Rogers, 13 U. S. App. 547, 6 C. C. A. 403, and 57 Fed. 378; Hewitt v. Railroad Co., 67 Mich. 61, 34 N. W. 659. The law in this regard is well stated by Judge Newman in Casey v. Railroad Co., 90 Wis. 113, 62 N. W. 624, referred to in the case of Reed v. Stockmeyer, and need not here be enlarged upon.

While it is the duty of the master to provide such appliances as are suitable and reasonably safe, that duty is one of ordinary care. The master is not required to supply the best or the safest or the newest appliances, but such as can with reasonable care be used without danger except such as is reasonably incident to the business. The master is not an insurer of the safety of the servant. He is bound, as is the servant, to exercise ordinary care; and with respect to safeguards when dangerous machinery is employed the test of negligence is the ordinary and prudent usage of the business,—what safeguards are commonly adopted by those in like business. Titus v. Railway Co., 136 Pa. St. 618, 20 Atl. 517.

The facts upon which our judgment must proceed are without contention. So far as the evidence discloses, the machinery in this mill was in all respects perfect. It is urged that the master failed in his duty in neglecting to provide some guard or protection which would prevent a plank forced over the dead rollers from coming in contact with the jump saw. It is contended that the evidence at the trial disclosed that some such precaution was usually and customarily employed in mills of like character, and that, if the testimony was conflicting, the fact was to be resolved by the jury, and not by the court. In the consideration, however, of the ruling upon the motion to direct a verdict, the court may properly consider the evidence so far as to determine whether any evidence has been given establishing such custom. There were several witnesses sworn upon that question on the part of the plaintiff below. The witness Brown gave his opinion that some such protection was necessary, but with respect to the fact of general usage the only mill which he could state which employed such a device was Ball & Culbertson's mill, where the swing-saw was used, that swung back into a box to keep anything from running upon it while not in use. When in use there was no protection. So here the jump saw, when not in use, sank below the table, and was only exposed when in use. The witness Carr testified to his knowledge of a device of a timber four by six, fastened with iron from below, coming down over whatever is being cut, and holding the material down over the table, so that it cannot rise. That device, he said, was in use in the Pine Tree Mill and in the Wyman & Ingram Mill; but the witness said that he could not say that such devices were generally used in sawmills in the state of Wisconsin; and that, notwithstanding he had resided in the state 14 years, and had been in a good many mills, he does not recollect of seeing them in any other mill than this mentioned. This device, it was subsequently explained by the witness F. McDonough, was employed to hold down and together a pile of slabs cut by the saw at one time, but was not used when slabs were cut

singly, as here.    In answer to a question whether it had ever been customary to use any mechanical device to prevent slabs or boards coming in contact with the jump saw except the dead rollers themselves, the witness answered, "I never saw anything to prevent, only the dead rollers." And in the Pine Tree Mill, where a jump saw was used, he stated that the live rollers ran past it or to it.    The witness Hadley testified that he had seen a device consisting of a piece underneath the table, so adjusted that the operator of the saw could throw a piece up ahead of the saw two inches high when he perceived lumber coming down upon the saw, but he said that he could not say that the device was in general use on jump saws at that time.    Here, under like circumstances, the saw was dropped below the table by the operator.    The witness Smith testified to the means used in but one mill, consisting of a stop at a point on the rollers in line with the band saw between the band saw and the slab saw and about four feet distant from the slab saw, and was operated by the man at the edger.    That mill was differently arranged from the one here.    In that mill there were two sets of live rolls, and "something to keep up the motion to some extent from one end of the mill to the other."    This device was placed alongside of the rollers upon which the slab saw was located, and on the set of rollers, in line with the band saw; but there was no guard or contrivance on the set of rollers upon which the jump saw was located to prevent lumber passing over the live rollers from coming in contact with it; but he said he had no knowledge of a general practice with reference to placing guards over these jump saws.    The witness Bowman could not testify in regard to mills in the state of Wisconsin, but stated that in a mill in Minnesota, constructed by him, there were what were known as the "lift-up" guards, and in that mill the slab saw was a swing saw, and was located in a direct line with the band saw, and that the live rollers extended to the slab saw. The testimony on the part of the defendant was to the effect that there was no necessity for any guard or contrivance to prevent lumber coming in contact with the slab saw where it was located out of the line of the live rollers designed to carry the lumber, and that no such guards in such case were in general use.    There were six witnesses who testified to that fact upon the part of the defendant below.

The testimony of the plaintiff below is wholly insufficient to establish a general usage.    It shows that in some few mills some sort of contrivance is used where the saw is in line with the rollers designed to carry the lumber.    The lumber projected from the live rollers upon the dead rollers would soon lose its momentum, and be cast but a few feet thereon.    The length of the dead rollers here was ordinarily more than sufficient to prevent the lumber being thrown against the saw, and, as we view the evidence, there is in fact no testimony which shows any general usage to supply jump saws, located as was the one in question, with any appliance to prevent lumber being projected against the saw.    The case in this respect is on all fours with the case of Ship Building Co. v. Nuttall, 119 Pa. St. 149, 158, 13 Atl. 65.    In that case one ground of negligence was

asserted to be the failure of the master to provide a circular saw with an attachment or "guard" or "spreader," which would prevent loose strips of wood from being caught between the teeth of the saw, and thrown backward upon and injuring those engaged in the service. The court observes:

"As to failure to provide a spreader, the case of the plaintiff is, if possible, more clearly without merit. The testimony shows that such an attachment is not in general use, and there is no general agreement among mill owners or practical sawyers that it is a desirable or useful attachment. It is not enough that some persons regard it as a valuable safeguard. The test is general use. Tried by this test, the saw of the defendant is such an one as the company had a right to use, because it is such as is commonly used by mill owners; and it was error to leave to the jury any question of negligence based upon the failure to provide a spreader."

It was not shown that the safeguard, the want of which is complained of, was generally adopted by those in like business, and it will not answer to submit to a jury the question of the negligence of the master upon opinions of experts stating what ought to have been provided, and to charge one with negligence for failure to provide accordingly. Unless it was shown that some such safeguard is usually and customarily employed by those engaged in similar business and under like circumstances, there was no proof of failure of duty by the master in omitting to employ it here. It is error to submit to a jury the question whether the master should have employed the device, in the absence of sufficient evidence of general usage; for jurors are not at liberty to charge a duty upon the master according to their own notions of what was proper under the circumstances, nor upon the opinion of experts of what was desirable and prudent; but they should determine the question of dereliction in duty by the master by the customary observance of those in like business; or, as the thought was well expressed in Titus v. Railway Co., supra: "Jurors must necessarily determine the responsibility of individual conduct, but they cannot be allowed to set up a standard which shall, in effect, dictate the customs or control the business of the community." See, also, Tinkham v. Sawyer, 153 Mass. 485, 27 N. E. 6. We conclude, therefore, that the evidence does not establish any failure of duty upon the part of the master in omitting to provide the safeguard considered.

If, however, it may be assumed that there was failure of duty here by the master with respect to the safeguard, its absence was an open, obvious fact. That it was wanting should have been observed by one of even slight experience in the business; certainly by one in the exercise of that ordinary care that the law casts upon the servant. The defendant in error was a man of mature years. He had had some six years' experience in this business. He was of ordinary intelligence, and was no novice. He knew the operation and the use of every piece of machinery employed. He knew that the service was a dangerous one, and that even with the utmost care accidents would occur. He knew that material striking the revolving saw would be hurled with great force towards the operator. What warning from the master could have given him better instruction than he had,—instruction acquired by the experience of six years

in the vicinity of dangerous machinery? In this connection we may well employ the language of the supreme court of Pennsylvania in the case of Ship Building Co. v. Nuttall, to which we have before referred as a case like the one in hand. Mr. Justice Williams, speaking for the court, says:

"All that could have been told him by way of warning was that there was a possibility of injury from a falling stick, but that during many years no such accident had happened in the defendant's works. That the omission of such a warning to a mechanic under the circumstances of this case was a failure of duty on the part of the employer, is simply preposterous. There is risk and liability to accident in all employments, but the law does not require an employer to protect his employés against the possibility of an accident. He is bound to provide suitable machinery and implements for their use, see that they are in reasonable order, and that the usual precautions against accident are taken. The possibility of accident which lies beyond is a risk which every mechanic and every laborer takes and must take as incidental to every form of activity."

It is said, however, that the servant could not anticipate that the operator at the edger would not remove one piece of lumber before another coming over the live rollers would strike it, force it over the space of dead rollers between the alley and the slab saw, nor that it would be swerved from its natural course by the direction given to it, either by the impinging force or by the operator in striving to secure it. That is true, and is equally true with respect to the master. The possibility was as palpable to the understanding of the one as to the other. The mill had been operated for some 10 or 11 years without that safeguard, and without accident from that cause. In marshaling the dangers that ordinary care would seek to guard against, it could hardly be anticipated that the piece of lumber would be projected such a distance over dead rollers, and would also be so swerved from its course that it would strike the slab saw, 22 feet away from the end of the line of live rollers, and north of the line of dead rollers extended westerly upon a direct line from the live rollers. Nor can it be said that the danger was a concealed one, growing out of any defective machinery. It arose from the manner of operation, not because of defective machinery; and therefore was a risk incident to the business. It is not necessary that a servant should be warned of every possible manner in which injury may occur. He must examine his surroundings, and take notice of obvious dangers and the operation of familiar laws. It is sufficient if he, being ignorant, be warned of the dangerous nature of the employment, and how safely to operate a dangerous appliance. Here the injury arose, not from the manner of the operation of the slab saw, but the manner in which other operatives performed or failed to perform their duties. The danger arising from such failure was necessarily incident to the employment. The servant cannot justly demand that he shall be warned against risks that are as obvious to him as to the master. Kohn v. McNulta, 147 U. S. 238, 241, 13 Sup. Ct. 298; Southern Pacific Co. v. Seley, 152 U. S. 145, 14 Sup. Ct. 530.

It is further insisted that the master was guilty of actionable negligence in failing to provide a sufficient number of servants,

and particularly in the failure—First, to provide two men, instead of one, to do the work in which the slab sawyer was engaged; and, second, to provide two men to work at the edger. and to receive lumber coming from the live rollers. With respect to the first alleged failure of duty, it is needful only to say that, according to the contention of the defendant in error, two men were engaged—Larson and himself—upon the work of the slab saw, and that the injury was in no way occasioned by the operation of the slab saw, and could not have been prevented if any number of men had been employed thereat. With respect to the second specification of failure of duty, it is to be observed that the test of the master's duty in this particular is the same as with respect to the presence of a safeguard,—what is usual and customary in like business. Upon this subject, of the five witnesses produced by the defendant in error, Brown, Carr, and Hadley simply give an opinion of the necessity of two servants to do such work, but fail to declare the custom in the business. The witness Smith states that at one mill there was a man employed to assist the edger, and that in that mill there was, in addition to the band saw, a re-saw, not present in the mill here, the product of which was also passed through the edger; and it was subsequently explained—if explanation were necessary—that, with double the product coming to the edger from both sides of it, one man would not be able to perform the labor. This is far from establishing either custom, usage, or necessity with respect to mills like the one in question. The witness Bowman speaks of an assistant to the edger in the only mill to which he referred. There skids were located between the edger and the live. rollers to receive the lumber coming over the rollers from the band mill; the edger being some four feet from the roller. Under these conditions the man operating the edger had nothing to do with stopping the lumber coming from the rollers. He received the lumber from the skid, his assistant removing the lumber from the rollers to the skid; and at that mill the live rollers extended from the band saw to the jump or slab saw. The conditions of things there and here were quite dissimilar. The evidence entirely fails to establish either necessity for two men at the edger, under the circumstances here existing, or that it was customary to engage more than one man for such service. Upon the whole case, therefore, there was no sufficient evidence to establish failure of duty upon the master here. It was consequently the duty of the trial court, upon proper request, at the conclusion of the evidence, to have withdrawn the case from the jury, and directed a verdict as requested by the defendant below.

The judgment must therefore be reversed, and the cause remanded, with directions to the court below to award a new trial.