## LAKE v. SHENANGO FURNACE CO.

(Circuit Court of Appeals, Eighth Circuit.    March 14, 1908.)

No. 2,614.

1. MASTER AND SERVANT—NEGLIGENCE—ASSUMPTION OF RISK—NUMBER OF SERVANTS—FACTS.

The deceased and two fellow servants had been operating a hand hoist and lowering timber with it into the shaft of a mine for about a month, when the master directed him to operate it with one co-workman, and he did so without objection. The hoist consisted of a chain attached to a rope which ran over a pulley suspended to a tripod above the shaft, and the other end of the rope was attached to a drum by which the rope was wound up by the use of adjustable cranks on the ends of the drum, and the descent of the load was controlled by a friction brake applied to the drum by a lever. After the chain was fastened around the load, it was necessary to wind the rope up until it was taut, and to apply the brake upon a signal from the chainman before the load slid or swung into the shaft, because it was so heavy that the workmen could not hold it up with the cranks. After six or seven loads had been safely lowered by the two men, the deceased, who was acting as chainman, directed his fellow workman to continue to wind up the rope so long that it slid the load into the shaft before the brake was applied. *Held*, the deceased assumed the risk of operating the machine in this way with but one assistant.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 559–566.

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

2. Same—Evidence of Change after Accident Inadmissible.

Evidence that after an accident a master employed more men, repaired his machinery, or adopted a different method in the conduct of his business, is inadmissible to prove his negligence at the time of the accident.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, § 918.]

3. Evidence—Opinion Evidence When Inadmissible.

When an issue, its subject-matter, and the facts which condition its decision are simple and open to the common understanding so that no special skill or experience is requisite to form a correct judgment upon it, the opinions of witnesses regarding it are not admissible.

4. Negligence—True Test of Doubtful Act Care Persons of Ordinary Prudence use under Same Circumstances.

An act or omission may be in itself clearly negligent or clearly free of negligence. If its character is doubtful, the test of actionable negligence is the degree of care which persons of ordinary intelligence and prudence commonly exercise in the same circumstances. If the care exercised in such a case rises to or above that standard, there is no actionable negligence; if it falls below that standard, there is.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Negligence, §§ 1–7.]

5. Same—Evidence of Ordinary Practice of Reasonable Men in Same Circumstances Generally Competent.

In such a case the evidence of the ordinary practice and of the usual custom, if any, of ordinarily prudent and intelligent persons in the performance under the same or like circumstances of the same or like acts, is ordinarily competent upon the issue of negligence in the performance or omission of an act.

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the District of Minnesota.

This is an action for damages that resulted from the death of John K. Laurila, which the plaintiff below alleged was caused by the negligence of the defendant company, his master, in that it employed only two when it should have hired three servants to operate the drum used at its shaft No. 2 to lower timber into its mine. The defenses were that the defendant was not negligent, that the deceased asssumed the risk of operating the drum with two men, and that he was guilty of negligence which contributed to his injury. At the close of the evidence the court instructed the jury to return a verdict for the defendant, on the grounds that the deceased assumed the risk of the work in which he was engaged, and that he was guilty of contributory negligence. This and many other rulings are specified as errors. The evidence relative to the place and circumstances of the accident was practically without contradiction, and it disclosed this condition of things:

The accident happened while Laurila and his companion, Tikka, were preparing to let a load of lagging down into the shaft during the afternoon of January 17, 1906. Laurila had been engaged in this work during the afternoons since about the middle of December, 1905, but prior to this day he had been one of three men operating the drum to lower the timber into this shaft, while on the day of the accident he was one of two. The shaft was about 6 feet by 8 feet, 137 feet deep, planked inside, and it had a crib or collar of timber which extended up above the ground a few inches. It was known as shaft No. 2. A tripod made of three posts rose over the shaft, and from it a bolt depended directly over the center of the shaft and about 19 feet above its mouth, to which a pulley was attached, over which the rope ran that was used to lower the timber. A small chain which was used to fasten the timber together and to hold it as it descended into the shaft was fastened to the end of this rope which hung from the pulley over the shaft, and the oth-

er end of the rope was secured to a drum which stood upon posts about three feet above the ground on one side of the shaft and about four feet distant from it. This drum was about 7 feet long and 10 inches in diameter where the rope wound about it. Upon one end of this drum was a friction brake operated by a lever five or six feet long, which rested upon the drum, and was made effective by pressing the outer end of it down. When the drum was used to wind up the rope, this lever was held above it by hand or by a stick placed under it, and, when a load was about to be lowered, the support was removed, the lever placed the brake upon the drum, and the descent of the load was controlled by an operator who pressed down upon the outer end of the lever. There was an adjustable iron crank about 18 inches long upon each end of the drum which was used to wind up the rope and to prepare the loads of timber for their descent, but which was removed before these loads were let down into the mine. Treating the apparatus from the station of a person standing on the side of the shaft opposite the drum and facing the latter, there was a stick of timber about six feet long and four inches thick which lay parallel to the collar on the right side of the shaft. The load to be lowered at the time of the accident was about two feet square, and it consisted then, and the loads were generally made up of posts and lagging from six to nine feet long which were laid across the collar of the shaft and the stick of timber so that they projected over the collar about a foot and rested upon the timber and upon the collar which was somewhat worn away, or upon the ice or snow which had gathered between the collar and the stick, so that the chain could be readily passed around each of the ends of the loads without raising them. It was winter, and some ice and snow had gathered about the shaft and upon the posts and lagging, and the surface where the load was placed sloped at the rate of about six inches to eight feet toward the shaft. The load which caused the accident weighed from 750 to 1,500 pounds. The loads lowered into this and other like shafts were generally so heavy that two workmen at the cranks could not hold one of them up after it swung over the shaft, and the only means of controlling its descent was the friction brake. When three men operated the drum, the first held up and upon a signal from the chainman applied the brake, the second adjusted the chain first around the end of the load in the mouth of the shaft, and next around the other end, and then held on to it with his hand until the third man, who operated one of the cranks, took the slack out of the rope and drew it taut by winding it upon the drum. When the rope was thus drawn sufficiently taut, upon a signal from the chainman, the first man pressed down upon his lever, and held the load, the third man removed his crank, the chainman let the rope go, went behind the load, and by lifting its rear end slid or pushed it into the shaft, and the first man then lowered it and controlled its descent by operating the brake. When two men used it, the brake lever was held up by a stick beneath it. One of the men adjusted the chain about the ends of the load, then held on to the rope or chain to steady it with one hand and on to one of the cranks with the other until under his direction the second man had wound the rope sufficiently taut by the use of the other crank. Then, upon a signal from the chainman, the second man removed his crank, removed the stick beneath the lever, seized the lever, and held the load with it until the chainman removed his crank, and slid or pushed the load into the shaft, when the second workman controlled and lowered it by the manipulation of the brake lever.

At the time of the accident the brake was held off the drum by a stick beneath the lever. Tikka and Laurila had lowered six or seven loads down the shaft without the aid of any third workman, with Tikka at the chain and Laurila at the crank, when Tikka took the crank and Laurila adjusted the chain and held onto it with one hand to steady it and onto the crank on his end of the drum with the other until the rope was wound up on the drum to some extent when Tikka inquired of Laurila if it was good, or in other words, if the rope was sufficiently taut, and Laurila replied: "No; wind it a little more." Tikka did so, the load slid into the shaft, the drum and the cranks escaped from the workmen as the load descended, one of the revolving cranks struck Laurila, threw him into the shaft, and killed him.

Theodore Hollister (John R. Heino, on the brief), for plaintiff in error.

H. H. Grace (George B. Hudnall, on the brief), for defendant in error.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

SANBORN, Circuit Judge (after stating the facts as above). The evidence in this case conclusively proved that there was one and only one indispensable condition of safety in the doing of the specific act in the performance of which Laurila lost his life in the lowering of the loads of timber into the shaft, and that condition was that the load should not be slid, or pushed, or swung into or over the shaft until the brake was applied to the drum by means of its lever. If the load went into the shaft before the brake was applied, it would as certainly descend and produce danger of injury and death when three as when two men were operating it, for the law of gravity is uniform and incessant in its work. The loads differed in size and weight, but both at this and at other shafts where similar devices were used they were generally, if not universally, so heavy that they could not be held up by the cranks upon the drums after they swung over the shafts, and this fact was well known to all the workmen about them, and was clearly proved to the jury. This was the reason why the friction brake was provided and used.

The evidence was uncontradicted that it was necessary before the load was swung over the shaft and after the chain had been thrown around its ends that the rope should be wound up so that it was taut, to the end that the timber might be drawn together in a compact body before it started to descend, so that sticks of it would not slip out of the chain and fall down the shaft. The evidence was clear and undisputed that it was the duty of the chainman to steady the chain with his hand as the rope was wound up, to determine when the tension upon it was sufficient to hold the timber together, and insufficient to slide, or tip, or swing the load into the shaft, and then to give the signal to take off the crank and put on the brake, and, after that was done, to push or slide the load into the shaft. This entire duty devolved upon the chainman whether there were two or three men at the shaft, and, in the discharge of this duty, was the one place where the exercise of judgment conditioned the safety of the operation. If the chainman failed to give the signal that the chain was sufficiently taut until the tension became so great that the load slid or swung into the shaft, immediate danger of injury was produced, and that danger was greater when but two men were operating than when there were three, because, if there was a third man at the lever, it was possible that he might catch and hold the load after it swung into the shaft, although he did not receive any signal to apply the brake.

The apparatus was simple. It was nothing but a windlass with a crank and a rope attached, the latter of which ran over a pulley above. No workman of intelligence sufficient to use the simplest tools could have assisted in operating this windlass with two la-

borers for a month and with one for an hour as Laurila did without plenary knowledge that the law of gravity would draw the load down the shaft if it was permitted to swing over it; that in such an event it could not be held up with the cranks; that the application of the brake before the load slid or swung into the shaft was indispensable to the safe operation of the machine; that he had but one assistant at the time of the accident; that, when he operated the chain, the timely application of the brake depended entirely upon his judgment and his signal; and that, if he failed to rightly exercise the former or to give the latter in time, disaster and injury were the natural and probable consequences of his dereliction. Yet, without objection or protest, he entered upon the discharge of the duty of chainman with a single assistant, and by his failure to give the signal to his companion to cease winding up the rope and to put on the brake until the latter had wound it so taut that it lifted or slid the load into the shaft he brought down upon himself the direful result.

A servant by entering or continuing in the employment of a master without complaint assumes the risks and dangers of the employment which he knows and appreciates. St. Louis Cordage Co. v. Miller, 61 C. C. A. 477, 490, 493, 126 Fed. 495, 508, 511, 63 L. R. A. 551, and cases there cited; Glenmont Lumber Company v. Roy, 61 C. C. A. 506, 510, 126 Fed. 524, 528; Burke v. Union Coal & Coke Company (C. C. A.) 157 Fed. 178, 180, 181. Counsel argue that the deceased did not fall under this rule because he did not know the weight of the load, because he did not know how much tension on the rope would raise the load or slide it into the shaft, and because he did not appreciate the danger from the act that he and his companion were performing that the load would slide into the shaft. They call attention to the testimony of the superintendent of the defendant that if the load lay as stated by the witnesses, and if it weighed 1,500 pounds, it could not have been sent into the mine by the use of one of the cranks by a workman because he could raise only about 300 pounds thereby, and to the testimony of the surface boss that in his opinion one man at the crank could not slide a load into the shaft if it rested on a few little projections on the top of a round surface of timber and to varying estimates made by witnesses of the weight of the load. There were, however, two men at the cranks—Tikka, who devoted all his energy to one of them, and Laurila, who used one hand upon the other. The superintendent testified that in his opinion the load weighed only 750 pounds, that a lift of 400 pounds on the rope would have sent it into the shaft, and that one man could lift 300 pounds upon the rope by the use of the crank. It follows that two men could lift 600 pounds, and, if both men exercised their powers, they could have thrown the load into the shaft. Moreover, an appreciation of the risk and danger was not conditioned by an exact knowledge of the weight of the load, or of the amount which one man could lift upon the rope by the use of one of the cranks. There was a crank upon each end of the drum and there was a man at work at

each crank. The fact that whether there was one man or there were two men at the cranks a signal was given when the rope was sufficiently taut demonstrates the knowledge and the appreciation by the workmen of the danger of permitting any man to exert all his force upon the crank without any limitation by a sign from the chainman. The only reason for the signal was to prevent the danger of sliding or swinging the load into the shaft before the brake was applied. It was the risk of this danger in the absence of the third man that confronted Laurila. He knew that the third man was not there, and that the brake could not be applied until he gave the signal to stop the winding of the rope. He knew that the load lay by the side of the shaft on an inclined plane upon the worn collar, the parallel timber, or ice and snow between them, that the load was so heavy that, if he permitted it to swing or slide into the shaft, he and his associate could not hold it with the cranks. He had assisted to operate that drum for many days. He knew that a signal had always been given to stop turning the crank before the load was pushed into the shaft, and the danger that he and his companion might slide it in there by turning the cranks if the signal was not given, or, if it was given too late, was too obvious, too plainly observable for denial. A servant cannot be heard to say that he did not appreciate or realize the danger or the risk where the defect is obvious or readily observable, and the risk and danger are apparent. St. Louis Cordage Co. v. Miller, 61 C. C. A. 477, 493, 126 Fed. 495, 511, 63 L. R. A. 551; Glenmont Lumber Company v. Roy, 61 C. C. A. 506, 510, 126 Fed. 524, 528.

It is said that the risk of the master's negligence is not one of the ordinary risks of the employment, and hence that the servant does not assume it, and this is doubtless true when the master's negligence and its effect are not known or obvious to the servant and the risk and danger from them are not appreciated; but if the servant knows of the failure of his master to completely discharge his duty to exercise ordinary care to furnish sufficient servants or ordinarily safe appliances, and if he appreciates its effect, or if the failure and its effect are obvious or plainly observable and he continues in the employment without objection, he elects to assume the risk of them and he cannot recover for the damages they cause. Texas & Pacific Railway Co. v. Archibald, 170 U. S. 665, 672, 18 Sup. Ct. 777, 42 L. Ed. 1188; Choctaw, Oklahoma & Gulf Railroad Co. v. McDade, 191 U. S. 64, 68, 24 Sup. Ct. 24, 48 L. Ed. 96; Burke v. Union Coal & Coke Company (C. C. A.) 157 Fed. 178, 181.

Counsel argue that the deceased did not assume the risk and danger of operating this machine with but one workman because his master did not warn him of them; but no duty rests on the master to warn a servant of risks and dangers that are so apparent that a person of his ability and experience in his station may reasonably be held to have known and appreciated them. Bohn Manufacturing Company v. Erickson, 5 C. C. A. 341, 344, 55 Fed. 943, 946; Glenmont Lumber Company v. Roy, 126 Fed. 524, 528–529, 61 C. C. A. 506; King v. Morgan, 48 C. C. A. 507, 510, 109 Fed. 446, 449; Railroad Company

v. Miller, 43 C. C. A. 436, 104 Fed. 124; Mississippi River Logging Company v. Schneider, 20 C. C. A. 390, 392, 74 Fed. 195, 197.

The next objection is that assumption of the risk was not pleaded by the defendant, but it rests on the maxim, "Volenti non fit injuria," and inheres in the contract of hiring, and, if it were necessary to plead it, a proposition that is not conceded, the answer contains an averment that "Laurila assumed the risks of injury incident to carrying on said work," which would have been sufficient in the absence of objection in the court below. The result is that the uncontradicted evidence disclosed the fact that the defect in the company's method of operation, of which the plaintiff complains, was obvious, and the danger from it was apparent, and he continued in the service without complaint. The defense of assumption of risk is conclusively established in such a case, no question remains for the jury, and the court rightly instructed them to return a verdict for the defendant. This conclusion rests upon the mere assumption, and not upon any decision or opinion, that there was substantial evidence at the trial below of the alleged negligence of the defendant. The question whether or not there was such evidence and the question whether or not the evidence of the contributory negligence of the deceased was conclusive are no longer material, and will not be farther discussed than to say that the testimony and the considerations which have already been set forth amply sustain the decision of the court below upon the latter question. We turn to the rulings upon the admission and rejection of evidence.

Specifications 1, 2, 3, 6, and 7 are leveled at the refusal of the trial court to receive testimony of the method of operation of the drum by the defendant and of the number of men employed by it for that purpose at shaft No. 2 after the accident. But evidence that, after the accident, a master repaired his machinery, adopted a different method of operation, or employed a larger number of men in conducting his business, is incompetent because it has no legitimate tendency to prove that the number of men employed, the method pursued, or the machinery used before the accident was not reasonably safe and sufficient, and because the reception of such evidence would deter the master from improving his methods and machinery. Railroad Company v. Hawthorne, 144 U. S. 202, 208, 12 Sup. Ct. 591, 36 L. Ed. 405; Motey v. Pickle Marble & Granite Company, 20 C. C. A. 366, 371, 74 Fed. 155, 159; Railway Company v. Parker, 5 C. C. A. 220, 222, 55 Fed. 595, 597; Camp Bird v. Larson, 81 C. C. A. 412, 414, 152 Fed. 160, 162.

The trial is attacked because the court below rejected the proffered testimony of witnesses familiar with the operation of the apparatus in the use of which the accident occurred that it was in their opinion dangerous to operate it with less than three workmen. But the rule is that witnesses must state facts, and not opinions. There is an exception to it that the opinions of witnesses who possess peculiar skill or knowledge may be received when the facts are such that inexperienced persons are likely to prove incapable of forming a correct judgment from them in the matter at issue without such opinions.

But there was nothing in the facts or in the subject of the issue in this case that was not open and plain to men of common understanding. When the facts were established it was as evident to the jury, or to any one of ordinary comprehension who knew them, as to the most experienced operator of the drum, whether or not the crucial signal could be given at the proper time with safety when only two men were operating the drum, and that was the real issue which conditioned the defendant's negligence. There was no necessity for the opinions of witnesses upon this question, and, when the necessity does not exist, the exception to the rule does not operate and the rule prevails. The testimony of the experts was properly excluded. Motey v. Pickle Marble & Granite Co., 20 C. C. A. 366, 370, 74 Fed. 155, 159; W. J. Lemp Brewing Co. v. Ort, 113 Fed. 482, 483, 51 C. C. A. 317; Ft. Pitt Gas. Co. v. Evansville Contract Co., 123 Fed. 63, 64, 59 C. C. A. 281; Mississippi River Logging Co. v. Schneider, 20 C. C. A. 390, 396, 74 Fed. 195.

Counsel assert that, while the court rejected the opinions of witnesses offered by the plaintiff below, it received the opinion of one of the witnesses for the defendant, in that it permitted him to testify that, if there was only a normal demand for timber underground, only four men would be set at work prior to the last of January doing all the labor connected with lowering down the timber in either or both shafts No. 2 and No. 3; but this charge is not sustained by the record. When the entire testimony of this witness is read and the statement challenged is considered in connection with the questions and answers which preceded it, the fact clearly appears that the meaning which this evidence must have conveyed to the jury was not that four men ought, in the opinion of the witness, to have been employed, but that four men were actually employed at the time and under the circumstances mentioned. The testimony was rightly received.

After the defendant had proved that the general conditions relative to the tripod and the drum were the same at defendant's shaft No. 3 as at shaft No. 2, where the accident happened, and that two men had ordinarily operated the drum and lowered the timber with it at the former shaft, a witness was permitted to testify over the objection of the plaintiff that it did not appear that the place for getting the timber down into the shaft was the same at No. 3 as at No. 2, that no accident had ever occurred at shaft No. 3 while two men were operating the apparatus. But this was competent testimony, because the real issue was whether or not the signal to apply the brake and remove the crank could be safely given at the proper time when two men were operating the drum, and that issue was conditioned by the tripod, the drum, the brake, the cranks, the rope, the pulley, and the chain rather than by the particular place where the load happened to lay before it was swung into the shaft.

Finally, complaint is made that the court permitted the defendant to prove that prior to this accident machines which were in principle, in method of operation, and in construction practically identical with that used by the defendant at shaft No. 2 had been, and at that time

were, commonly used by mine owners and their workmen in the mines in the vicinity of the defendant's mine, for the purpose of lowering timber into the shafts, and that ordinarily two men operated them. It is said that this testimony was inadmissible because the defendant failed to prove that the particular places on the sides of the shafts where the respective loads lay before they were lowered into the shafts were in the same condition as was that upon which Laurila's load was placed. But this was not an insuperable objection to the evidence, for the conditions of the places where such loads are placed necessarily vary with the times, the seasons and the locations of the shafts, and these places were not determinative of the question whether or not the employment of two rather than three men to operate shaft No. 2 was a failure to discharge the defendant's duty to exercise reasonable care to employ a sufficient number of men to operate it with reasonable safety.

There are cases in which the act or omission at issue is in itself so clearly negligent that the fact that other persons in the same or like circumstances have been guilty of it is insufficient to modify its character or effect. Dawson v. Chicago, R. I. & P. Ry. Co., 52 C. C. A. 286, 288, 114 Fed. 870, 872; Gilbert v. Burlington, C. R. & N. Ry. Co., 63 C. C. A. 27, 32, 128 Fed. 529, 534. The defendant's act or omission was not of that character; and in such a case the true test of actionable negligence is the degree of care which persons of ordinary intelligence and prudence commonly exercise under the same circumstances. If in a given case the care exercised rises to or above that standard, there is no actionable negligence; if it falls below it there is. Hence, in an action for damages for negligence, evidence of the ordinary practice and of the uniform custom, if any, of such persons in the performance under similar circumstances of acts like those which are alleged to have been negligently done is generally competent evidence, for it presents to the jury the correct standard for their determination of the issue whether or not the defendant was guilty as charged. Grand Trunk Ry. Co. v. Ives, 144 U. S. 408, 416, 417, 12 Sup. Ct. 679, 36 L. Ed. 485; Union Pac. Ry. Co. v. Daniels, 152 U. S. 684, 691, 14 Sup. Ct. 756, 38 L. Ed. 597; Washington, etc., Ry. Co. v. McDade, 135 U. S. 554, 569, 10 Sup. Ct. 1044, 34 L. Ed. 235; Texas & Pac. R. Co. v. Barrett, 166 U. S. 617, 619, 620, 17 Sup. Ct. 707, 41 L. Ed. 1136; Choctaw, etc., R. Co. v. McDade, 191 U. S. 64, 67, 24 Sup. Ct. 24, 48 L. Ed. 96; Charnock v. Texas & Pac. R. Co., 194 U. S. 432, 437, 24 Sup. Ct. 671, 48 L. Ed. 1057; Chicago Great Western Ry. Co. v. Egan (C. C. A.) 159 Fed. 40.

There was therefore no error in the admission of this evidence, and the judgment below is affirmed.