## MOUNT MARION COAL MINING COMPANY v. ELLA HOLT ET AL.

### Decided March 13, 1909.

**Assumed Risk—Proximate Cause—Evidence.**

In a suit for damages for the death of an employee caused by falling into a mining shaft, pleading and evidence as to the alleged negligence of the defendant and the character of the appliances at the mouth of the shaft for dumping the cars, considered, and held to show that the deceased was familiar with the character and operation of said appliances and the risks arising therefrom and that he assumed said risks; also that the evidence failed to show that the alleged negligence of defendant was the proximate cause of the accident, and the court should therefore have instructed a verdict for defendant.

Appeal from the District Court of Palo Pinto County. Tried below before Hon. W. J. Oxford.

*John W. Wray,* for appellant.—The court erred in refusing to give the peremptory instruction to the jury to return verdict for defendant, asked by defendant when the plaintiffs closed their case, on the ground that the plaintiffs had wholly failed to show such facts as created liability on the part of the defendant for the death of the said James Holt, and wholly failed to show such negligence on defendant's part, contributing to the death of the said James Holt, as would render the defendant liable.

The decedent assumed the obvious risks and dangers incident to the employment. He is presumed to have been an ordinarily intelligent man, and could not shut his eyes to the physical surroundings and refuse to observe that there were no gates or bars to the opening, and that if he pushed the car over into the shaft in the absence of the cage it would fall in. Klutts v. Gibson Bros., 37 Texas Civ. App., 216; Smith v. Armour, 37 Texas Civ. App., 633; Bryan v. Intr. Ry., 90 S. W., 696; Texas & P. Ry. v. Bradford, 66 Texas, 732; Railway v. Somers, 78 Texas, 441; Lake v. Furnace Co., 160 Fed. Rep., 892; National Biscuit Co. v. Nolan, 138 Fed. Rep., 12; Western U. T. Co. v. Burton, 115 S. W., 368; St. Louis S. W. Ry. v. Hynson, 101 Texas, 543; Ramm v. Ry., 92 S. W., 427-8.

*W. P. Gibbs, Albert Stevenson* and *E. B. Ritchie,* for appellees.— To charge the servant with the assumption of an obvious risk, it is not sufficient to show that he knew the physical situation and the condition of the instrumentalities, but it must also appear that he comprehended the danger arising from the defects complained of. Labatt, M. and S., sec. 279a and notes 1 and 3, citing: Rummell v. Dilworth, 111 Pa., 343, 2 Atl., 355; Galveston, H. & S. A. Ry. Co. v. Smith, 57 S. W., 999; Railway Co. v. Hughes, 54 S. W., 264;

Dillingham v. Harden, 26 S. W., 914; Burns v. Tel. and Tel. Co., 67 L. R. A., 956; Donahew v. Kansas City, 38 S. W., 571.

Comprehension of the risk by the servant will not be inferred from a mere knowledge of the material conditions where the servant has had but little or no experience, unless the defects are such that the nature and extent of the danger may as readily be comprehended by an inexperienced as by an experienced servant; and the question is one for the jury. Labatt, Master & Servant, sec. 395 and note 2, sec. 397, note 1.

CONNER, CHIEF JUSTICE.—Appellee, Mrs. Ella Holt, is the surviving wife, and the remaining appellees are the surviving children, of James Holt, who, on about April 30, 1904, fell into one of appellant's mining shafts and as a result thereof was killed. They recovered a judgment in the sum of forty-five hundred dollars, from which this appeal has been prosecuted. Substantially the only question presented to us is the sufficiency of the evidence to authorize the submission of the case to the jury. Appellees thus state the evidence upon which the judgment rests:

"The shaft of defendant's mine was divided into two compartments by a heavy wooden partition, each being about six by eight feet in size. There were two landings above the surface, one at the ground and one above, called the tipple, the latter being fifteen or eighteen feet above the former. At the top landing or tipple the coal, slate, etc., were dumped; and at the ground or lower landing the water was dumped. The mouth of the shaft at the ground landing was fenced on three sides, the side where the water cars were taken off being open, the fence being of pickets one by four in size and about four feet high. There were large pillars around the mouth of the shaft supporting the tipple, etc., above; also guides at the sides of the shaft for holding the cage in position. The cages were four feet ten inches by six feet one inch and consisted of a floor and top, the latter made of a solid flat sheet of iron, the floor and top being connected by iron rods at the four corners of the cage. And the roof is a little smaller than the floor, is flat, and is about six and one-half feet from the floor. Witnesses Poole and Warren estimated that the roof was seven or eight feet above the floor. There was nothing visible about the cage when standing at the landing except the floor and the top, or bonnet. At the ground landing there was a flat sheet, made of iron, some twelve by fifteen feet or more in dimensions, on which was a track corresponding to the track on the cage.

"According to the witness Warren the box of the water car was about six feet long and three deep, and the cars about three and one-half or four feet high; were built of two-inch stuff and were heavy, especially when wet and soggy.

"Witness Brookline testified that the trucks of the cars were twelve inches in diameter and that the cars were twenty-two inches deep, making a total height of twenty-eight inches. Witness Poole testified that he had made some of the cars and that they were about five feet long and twenty-four or twenty-five inches deep and about three feet from the ground, and weighed 400 or 500 pounds.

"Witness Warren testified that it was his understanding that the boss had assigned to Holt the duty of emptying the water cars on the day he was killed. It was some time in the afternoon when he fell into the shaft. He had no regular line of duty, but did whatever was assigned to him to do. Brookline testified that Holt's duties at the time of his death were to take off the water and slate cars and dump them. The slate cars were dumped at the upper landing or tipple. Witness Geyer testified that he was the father-in-law of Holt; that Holt had been at work at appellant's mine more than a year; and that he had never seen him pulling off water cars at any time during that period.

"At the time Holt was killed there were no bars or gates guarding the entrance to the mouth of the shaft. Witness Poole testified, among other things, as follows: 'Some two or three months before Holt was killed I had a conversation with Mr. Whittsell, the superintendent, about the matter of putting up some protection there. We were working seven days in the week then, and I asked him one Sunday morning if he could not provide some way to get gates there at the opening where the cars were handled, for the protection of the people who worked about the mouth of the shaft. He told me that after we got to the coal he would fix it so that nothing would fall in. We were then within eight or ten feet of the coal. At the time of Holt's death if there was any protection or gate there to keep anything from going into the shaft I don't know it. There was a protection put up there after Holt fell in. I do not remember how long after Holt's death, but it was only a few days.'

"Witness Geyer testified that between Monday and Friday following Holt's death a bar was placed at the entrance of the shaft. Witness Walter Warren, weighing clerk for appellant at the time, testified that there were bars at the entrance of the shaft to prevent the cars from running back into the shaft when the cage was not in position, but did not know whether they were there the day Holt was killed or not; that when the bar was in position nothing could go into the shaft, a car nor anything else. Witness Brookline, mine foreman of appellant at the time, testified in substance to the same facts. Also that the men had orders to close the gate every time they pull a car off the cage, even if the car is off only for a moment.

"Following the death of Holt, marks were found on the flat sheet where the accident occurred that appeared to have been made by Holt trying to hold back the car which was precipitated into the shaft. Witness Poole testified that they commenced about four and one-half feet from the shaft and ended about three feet from it. Holt wore heavy miner's shoes with heavy roundheaded tacks in them. James Holt testified that he examined the landing, etc., about three hours after Holt's death, and that the surface was slick and wet, and looked slippery.

"In returning the water car to the cage Holt, or anyone doing that work, would push the car, and would be more or less in a stooping position, and in pushing the car back to the shaft it would be between him and the opening. Witness Poole further testified as follows: 'It would be owing to what kind of a start a man gave the car as to

how much force it would take to stop it in returning to the cage. If he pushed it fast he would have to hang on to it pretty hard to stop it. It has considerable weight and would be hard to hold. I am not sure about the track of this water car, but I think it was on a level all the way from the landing to the dumping place. I have sometimes used considerable effort to stop the car.' Further, that he had handled the water cars himself when not doing other work; and that at the time of the trial the company was not using the cars, but was using pumps instead."

After careful consideration we feel constrained to sustain appellant's first assignment of error complaining of the court's refusal to give to the jury a special requested instruction to find for appellant. The only negligence alleged that has any support whatever in the evidence is the "failure of the defendant to construct a good and safe appliance or stops to prevent said water car from being pushed into said shaft." Assuming this to constitute negligence, the absence of such "appliance or stops" must have been perfectly obvious to the deceased. The evidence is undisputed that he had worked around the mouth of the shaft a number of months, and if he never before was engaged in emptying water cars he must have known, without greater experience than the day had afforded him, of the weight of the water car, the condition of the platform upon which it was operated at the surface, the fact that there were no stops, and that the car would inevitably fall into the mouth of the shaft if pushed therein in the absence of the cage. There is nothing in the evidence indicating that it was the duty of those operating the cage not to remove it while the deceased was emptying the water car, and its absence, with any degree of attention, must have been apparent to James Holt before the car fell. Indeed, actual knowledge of the absence of the cage is indicated by the hobnail marks on the flat iron sheet at the mouth of the shaft. The dangers arising out of this situation, it seems to us, were such as were apparent to any person of sound mind acting with due care, and of the experience the deceased was shown to have. So that we are forced to the conclusion that we must attribute to James Holt not only a knowledge of the facts relied upon as establishing negligence on appellant's part, but also knowledge of the dangers arising therefrom. Hence, under a long line of decisions, he assumed the risks of the situation so known to him, and appellees are without right of recovery. See Klutts v. Gibson Bros., 37 Texas Civ. App., 216; Smith v. Armour, 37 Texas Civ. App., 632; Bryan v. International & G. N. Ry., 90 S. W., 696; Texas & P. Ry. v. Bradford, 66 Texas, 732; Missouri P. Ry. v. Somers, 78 Texas, 441; Lake v. Shenango Furnace Co., 160 Fed., 892; National Biscuit Co. v. Nolan, 138 Fed., 12; Western U. T. Co. v. Burton, 115 S. W., 368; St. Louis S. W. Ry. v. Hynson, 101 Texas, 543; Ramm v. Galveston, H. & S. A. Ry., 92 S. W., 427-8.

In addition to what we have above said, it is by no means clear from the evidence that want of stops for the water cars had any causal connection with James Holt's death. The fact that he fell into the shaft was not a necessary sequence of the car's fall. If he was in the exercise of ordinary care for his own safety, as we must attribute to

him, certainly he would have let the car go and saved himself. There is nothing in the evidence to indicate that he was in front of the car and thereby thrown in. It may have been that without observing the absence of the cage he gave the car considerable momentum, that some part of his clothing caught upon some projection of the car, and that he was thus dragged to his death. Or it may have been that the deceased did not observe the absence of the cage until the car was near the mouth of the shaft, and that in his effort to prevent the car from falling he slipped and fell in after it. But no person seems to have seen James Holt immediately preceding his fall, or to know just what he was doing or how the unfortunate occurrence happened, so that it can only be conjectured, and the case on the issue of proximate cause, seems to fall within the principle applied by our Supreme Court in the case of the Texas & Pac. Ry. v. Shoemaker, 98 Texas, 451.

On the whole, we conclude that the court should have given the peremptory instruction requested, and that the judgment must be reversed and here rendered for appellant.

*Reversed and rendered.*

Writ of error refused.