Fort Worth Light & Power Company et al. v. John Moore.

Decided April 8, April 29, 1909.

**1.—Master and Servant—Electric Wires—Assumed Risk.**

An experienced lineman, climbing a telephone pole on either side of which ran wires of the city electric light system and of a light and power company, was shocked and caused to fall by placing his hand on an iron spike in the pole for use in climbing it. This was charged with an electric current by contact with one of the city wires which had sagged against it, such wire, not ordinarily carrying a current by day, being charged by contact elsewhere with a live wire of the light and power company, and a circuit for the current being closed by plaintiff's contact at the same time with the messenger wire supporting the telephone company's cable. The situation and relation of the respective wires and the spike were obvious, and though plaintiff did not know that the city wire was charged, he testified that it was his duty to see whether it was safe to climb the pole and that electricians consider all wires as possibly charged and dangerous. Held that the risk was one assumed by plaintiff as a servant and he could not recover against his employer, the telephone company.

ON MOTION FOR REHEARING.

**2.—Practice on Appeal—Verdict—Judgment—Apportionment of Damages.**

In a suit against a city, an electric light and power company, and a telephone company, by an employee of the latter, for personal injuries, plaintiff had a verdict against the telephone company for $3,000, and the light and power company for $1,000, and judgment was rendered in his favor for $4,000 apportioned between defendants in accordance with the verdict. Both appealed, but only the telephone company presented a brief, and on this the judgment as to it was reversed and rendered in its favor. In a motion for rehearing appellee sought to have the judgment reformed and rendered against the light and power company for $4,000 on the ground that both defendants were equally liable for the tort and the apportionment of damages was unwarranted. Held, that such relief could not be granted in the appellate court in the absence of complaint of the judgment by appellee in the trial court or cross-assignment by him on appeal.

Appeal from the District Court of Tarrant County. Tried below before Hon. M. E. Smith.

*A. P. Wozencraft, Wm. D. Williams* and *D. A. Frank,* for appellant, the Southwestern Telegraph & Telephone Company.—Under the facts in evidence in this case, where the uncontradicted testimony showed that the plaintiff knew of the alleged defects which caused his injury and of the danger arising therefrom, plaintiff assumed the risks of the conditions of which he complained, and he could not recover from the defendant because of injuries occasioned thereby. Texas & P. Ry. Co. v. Bradford, 66 Texas, 732; Gulf, C. & S. F. Ry. Co. v. Williams, 72 Texas, 159; Missouri Pac. Ry. Co. v. Somers,

78 Texas, 439; Texas & P. Ry. Co. v. French, 86 Texas, 96; Missouri, K. & T. Ry. Co. v. Wood, 35 S. W., 879; Ely v. Railway Co., 40 S. W., 174.

The true rule of law is that plaintiff assumed the risk of all injuries which were naturally and reasonably incident to such conditions as were or ought to have been known to him, while the charge of the court made the assumption of risk by the plaintiff to depend upon his knowledge of the dangers themselves. Missouri, K. & T. Ry. Co. v. Wood, 35 S. W., 879; Texas & P. Ry. Co. v. Bradford, 66 Texas, 732; Missouri P. Ry. Co. v. Somers, 78 Texas, 439.

The wires of the city of Fort Worth and the wires of the Citizens' Railway & Light Company were no part of the plant furnished by this defendant, and this defendant was under no obligation to keep the said wires in such condition that they were safe for plaintiff to work among, and was not liable to the plaintiff for the negligence of an owner of said wires in maintaining the same. Georgia R. & B. Co. v. Friddell, 11 Am. St., 444; Dixon v. Western U. Tel. Co., 68 Fed., 630; Chattanooga Elec. Ry. Co. v. Moore, 82 S. W., 478; Lucas v. Railway Co., 73 S. W., 589.

*McLean & Carlock,* for appellee.—The "uncontradicted evidence" does not show that plaintiff knew of the alleged defects which caused his injury and the danger arising therefrom, but the evidence does show that plaintiff at the time of his injury used ordinary care to observe and protect himself against the defects incident to his work, and that he did not know of the danger of putting his hand on the iron step, which caused the injury, in attempting to climb the pole. Bonnet v. G., H. & S. A. Ry., 89 Texas, 72; Missouri, K. & T. Ry. v. Hannig, 91 Texas, 347; Peck v. Peck, 99 Texas, 10; Smith v. Buffalo Oil Co., 41 Texas Civ. App., 267; Gloucester Electric Co. v. Dover, 153 Fed., 139; San Antonio, etc., Ry. v. Engelhorn, 24 Texas Civ. App., 324.

HODGES, ASSOCIATE JUSTICE.—John Moore, plaintiff in the court below, filed this suit in the District Court of Tarrant County against the Fort Worth Light & Power Company, the Southwestern Telegraph & Telephone Company, and the city of Fort Worth, claiming damages in the sum of $25,000 for personal injuries alleged to have been sustained by him in July, 1907, while in the service of the Southwestern Telegraph & Telephone Company, and occasioned by certain concurrent acts of negligence on the part of all the defendants. The trial resulted in a verdict in favor of the appellee for the sum of $4,000, which the jury apportioned as follows: $3,000 against the appellant, the Southwestern Telegraph & Telephone Company, and $1,000 against the Fort Worth Light & Power Company. Separate appeal bonds were executed by each of these defendants, and assignments of error filed in the trial court; but the telephone company alone has filed briefs in this court.

The issue upon which we think this case should be disposed of is presented in the first assignment of error, in which the sufficiency of the evidence to sustain the verdict and judgment is questioned. It

is claimed by the appellant telephone company that the testimony of
the appellee as to the conditions under which the accident occurred
discloses a situation showing that he assumed the risk of the danger
he encountered, and the consequent injuries therefrom. The testi-
mony shows that on the morning of July 19, 1907, the appellee and
another employe of the telephone company were sent out to put in
a telephone near where this injury occurred. After they had ascer-
tained that the occupants of the premises wanted the telephone, the
appellee, of his own accord, began to ascend one of the telephone
poles, for the purpose of making an inspection in connection with
the work in which he was then engaged. This pole stood near the
crossing of one of the streets in the city of Fort Worth. There were
many telephone wires running east and west strung to this pole. Iron
spikes were driven into the north and south sides of the pole for use
in climbing it. The city of Fort Worth had two wires on the same
side of the same street, also running east and west. The city wires
were suspended from city poles, but were not attached to the tele-
phone pole; they hung about twenty-five feet above the ground and
below the telephone wires; one of the city wires passing on the north
side of the telephone pole, and the other on the south side. A few
inches outside of the city wires and at the same level two light and
power wires which did not belong to the defendant light and power
company also straddled the telephone pole, running parallel with the
city wires. These light and power wires were suspended from the
same pole which carried the city wires, but were not attached to the
telephone pole. There was testimony from which the jury were justi-
fied in concluding that the city wire on the north side of the telephone
pole was in contact with one of the iron steps about twenty-five feet
above the ground, and that this contact had existed for some time
before the accident, though how long it is not clear. The appellee
ascended the telephone pole till he got about twenty-five feet from
the ground, and had to swing himself partially to the south side in
order to avoid contact with the city's north wire, the wire on the
south side of the pole being farther off than on the other, and more
easily permitting the passage of his body without contact. In detail-
ing the circumstances immediately attending the accident, the appellee
testified: "I was going up this pole to test a pair of wires to con-
nect this phone that we were going to put in. When this occurred
I had not reached the place where I was going to do the work. I
was just ordinarily like a man climbing a pole—one foot up, reaching
up with my hand, you know, and climbing up. It was the right
hand that I think came in contact with the live wire, and the left
hand was down about eighteen inches on the next step below on the
opposite side, against a messenger wire—the support of the cable, it
is a heavy wire to hold up one of those cables, which is connected
with the ground; and it was my right hand that grasped the other
side or the opposite side. With my left hand I had hold of a step
also, but this messenger wire was tied around the pole just above this
step. I was holding to those steps to climb the pole. Those were
the steps that were provided for that purpose. I didn't succeed in
grasping the step with my right hand before I was shocked. I could

not tell how I caught the wire, for just as I saw I had touched, you know—and that noise—and that is the last thing I remember. I don't know whether I grasped it or what I done. I just reached up, and as I reached up I laid my hand on the step. This noise—I heard something like a bug passing my ear and I fell. . . . I didn't know there was any wire resting upon that step at all. In climbing the pole those wires that were hanging there—there were four of them, two on each side of the pole—I was going up and faced toward the pole this way, and the wire on this side lay up near the pole. Those two and the two on this side swung off farther from the pole. They were two of the city's wires and two of the electric light wires. The electric light wires of the power company was on the extreme side. The city wires was the near ones. One city wire was on this side, and one on this side; and those on this side of the pole were swung off something like a foot or more, while this lay up close to the pole, tolerably close, something like three or four inches; I could see that from the ground before I went to ascend the pole. Naturally, a man climbing a pole, where there are steps that way on one side of the pole he will throw himself around and swing and reach that way in order to put himself up between the wires in the most space where he will keep himself as clear as much as possible, and that is the way I was; that was my position in going up this pole. When I went to pass up between the wires I swung myself around to the south side of the pole, and for that reason I could not see the step around here where I taken hold. . . . The messenger wire that the cable is on has got a connection to the ground, but it goes on probably a half mile before it gets to it, and before it gets to the office it has several connections to the ground. These connections are made to the ground all along. When I had hold of this step where the messenger wire was put just above it my finger went against this messenger which was connected with the ground; that was my left hand. My right hand went up and taken hold of this step, with this city incandescent wire lying against, or which was lying against the wire. The step I put my right hand on was on the north side of the pole, and the other one was on the south side. The Citizens' wire was something like fifteen or eighteen inches away from the pole on each side." The evidence from other sources tended to show that the city wire was in contact with the iron step on the north side of the pole, and that the insulation on that wire had worn off at the point of contact and thus permitted a current from it to be communicated to the step. It was also shown that the city did not use its wires during the daytime, but only for purposes of illumination at night, and on this particular occasion the current for that purpose from the city's plant had been shut off and there was no danger from contact with this wire, unless charged from some other and unauthorized source. Those city wires were therefore during the daytime supposed to be harmless unless accidentally charged. There was testimony to show that on the day of this accident, and also the day previous, there was a contact between a wire of the Fort Worth Light & Power Company and this city wire, some distance away from where this injury occurred. It resulted from the wire of the Fort Worth

Light & Power Company dropping from its fastening and lying across the city wire. The fall was caused by a wooden pin supporting a glass insulator rotting and giving way. In this way, it is claimed by the appellee, a current was communicated to the city's wire, and this was the cause of the shock received by him at the time and caused him to fall. As to his knowledge of the conditions existing at the time he was injured, and his duties under the circumstances, we gather the following from appellee's testimony: He was a man of mature years, and an experienced lineman; had been in the business about nine years, and was thoroughly familiar with all of the duties and responsibilities incident to the capacity in which he was then employed; had previously been an inspector, but was not then working as such. He was also fully acquainted with the system of wires among which he was called upon to work upon this occasion, and knew the conditions existing at the point where he fell, except that he disclaims any actual knowledge of the fact that the city wire was in contact with the iron step upon which he placed his right hand in climbing the pole. He had never climbed this particular pole before, but had seen others climb it in safety, and from that inferred that he could also climb it with safety. Before starting up the pole he could and did see the situation of the wires on each side of the pole, except as to the contact before mentioned. He saw the four wires which did not belong to the telephone company swinging loosely and several feet below the telephone wires—two on each side of the pole he was to climb. He knew that two of them belonged to the city, and the other two to the Citizens' Company, as it is called. He also knew the uses to which each system of wires was put; and there is nothing to indicate that he did not further know, in a general way, their respective routes and connections over the streets of the city. While he says he could not tell whether the city wire was lying on or against the iron step when he was standing on the ground, he admits that he could and did see that it was in very close proximity to it. As to his duty in protecting himself against dangerous places, and inspecting the situation in which he was called to work, he says: "When I go out and repair a wire, it is my duty to see if I can get up a pole safely or not. It is my duty to see that it is safe for me to climb the pole. It is, of course, my duty, when I go out there to repair or put up a telephone in the manner in which I did on this occasion, to see whether it is safe for me to climb the pole or not. It is my duty, and no one else's; it is my own alone. And when things look safe to me I go ahead. It is my duty to see that where I am going to work looks safe." Again he says: "It is considered by electricians that every wire is considered charged that you are liable to come in contact with. You are supposed to stay clear of all of them. In going up a pole amongst a lot of telephone or electric wires, in most cases you are to deal with each wire as if it were charged with electricity." He thus testified in response to the question as to whether or not he could see the wire resting upon the pin, or step upon which he was to put his hand: "Well, I say that I didn't see it. I didn't say that I could not have seen it; I simply

say that I didn't see it. If I had climbed up there and crawled around the pole and looked in there I could have seen it; I could not have seen it from where I was without I swung around the pole. I throwed myself around far enough on the south side of the pole that I could not see the step, and yet that was a step which was immediately close to a hot wire, but that is not supposed to be a hot wire; it is capable of carrying a heavy current, and did carry a heavy current when it was in use, but it was supposed to be a dead wire in the daytime. I regarded it as dangerous, and swung out of its way. That is what I was trying to do. I swung out of its way to keep from hanging my clothes or tools and bothering me about climbing. I swung out of its way so in case there was anything the matter with it to keep it from coming in contact with me or hanging on my tools." Upon the same subject he again says: "At the time I got the shock I was still climbing up the pole, and I grasped the step with my right hand. The city's wire was lying against that step, or I suppose it was lying against it. Well, no suppose about it, for it was against it. Prior to the time I got the shock I didn't notice it was lying against it; I didn't see it against it; but I knew it was close to it, though, or bound to be, for I could see that just from going up the pole; but I was not afraid to take hold of it. The city's wire was not charged in the daytime." As to his knowledge and appreciation of the danger of the situation he says: "When I saw it hanging there in that condition I knew that it was ———— that a man could possibly get hurt from it; yes, I knew a man could possibly get hurt unless he used ordinary care in swinging himself around as I did. The wires were not as close on the other side as on that side; they cleared the pole something like a foot. I was guarding myself against coming in contact with them on the south side; I was swinging myself around here." Again he says: "When it came time to go up there (meaning the pole) I went up notwithstanding that I knew in advance that those wires were in the condition that I had thought previously was dangerous, but I was using all the care I could to keep from coming in contact with them. I didn't directly undertake by my own skill and care to avoid a danger which was obvious and which I knew before I undertook to climb that pole. I climbed it because I seen those wires there and they looked clear. I didn't know it was dangerous when I climbed it. I said that a man could possibly come in contact with it before, and coming in contact with hot wires is a dangerous thing; and there was a space where I could possibly come in contact with hot wires. I went up there and undertaken to keep myself clear from the wire." In still another place he says: "I knew it was somewhat dangerous to an extent; just from observation you could see that an accident could occur there. The way I taken chances on that was by seeing other men go through the same place. Of course, a man takes chances to a certain extent; I taken the chances there in a certain way; that way was that I had seen other men ascending the same pole and not get hurt; and yet just from observation, and from the way things had been going on, I thought it was safe, as it had been there so long to my knowledge." "Q. I didn't ask you that; and you testified

awhile ago that you thought it was dangerous and you might get hurt there." "A. I said that it looked dangerous, but seeing other men go through there it led me to believe it was safe." Appellee further testified that his left hand touched the messenger wire which was grounded some distance from that pole at the time. His right hand came in contact with the charged electric wire. He received a shock which caused him to fall from the pole. He says that had he not made a closed circuit in that way he would not have sustained any shock by his right hand coming in contact with the electric wire. And he further says that he did not look out for the messenger wire at all; it was right down on the side where he was supposed to take hold.

We deem it unnecessary to narrate any of the testimony of any of the witnesses which tended to contradict the statements of the appellee. The injuries sustained by the fall form the basis of the suit. Inasmuch as we dispose of the case upon the first assignment of error, it will have to be done on the assumption that his testimony shows that he is not entitled to recover.

The acts of negligence here charged against the telephone company are, that it failed to furnish the appellee with a safe place in which to work. Narrowed to a more specific detail, it charged the failure of the appellant to provide some suitable method for preventing the electric wires of the city from coming in contact with the step on the pole which the appellee climbed and from which he fell. It is not contended that the city wire's becoming charged with an electric current at this unexpected hour was due to the negligence of this appellant, but this dereliction is attributed to the Fort Worth Light & Power Company, and was the basis for the judgment rendered against that company in the trial below.

The general rule that the master owes the servant the duty to exercise ordinary care to provide a safe place in which to perform his labor is too elementary to need discussion. It is also well settled that the servant can not recover on account of a negligent failure of the master to perform this duty, when such failure is known to the servant, or could have been ascertained by him in the exercise of that degree of care and circumspection which an ordinarily prudent person would use for his own safety under the same or similar circumstances. St. Louis S. W. Ry. Co. v. Hynson, 101 Texas, 543, 109 S. W., 929; Texas & P. Ry. Co. v. Bradford, 66 Texas, 732, 2 S. W., 595; Barnet v. Galveston, H. & S. A. Ry. Co., 89 Texas, 76, 33 S. W., 334. We do not understand that counsel for appellee controvert this general proposition; but they insist that in order to preclude a recovery by the servant he must also know of the existence of the danger likely to result from such dereliction of the master, or that the danger must be so apparent that it would be seen and appreciated by a person of ordinary prudence. As an abstract question we may concede this to be correct. But it finds a practical application in cases where inexperienced servants sustain injuries from defective appliances or places of work, and where the facts show that they were incapable, by reason of their inexperience, of appreciating the peculiar dangers to which they were exposed. In cases of experienced employes the

existence of the defect, or abnormal condition, is generally considered sufficient to indicate the dangers that may necessarily or probably result therefrom; and the knowledge of the latter will generally be presumed from the knowledge of the former. If the servant be experienced in his particular line of work he will be charged with a knowledge of such dangers as either necessarily or in the ordinary course of events are likely to result from the abnormal situation of which he knows. Texas & P. Ry. Co. v. Bradford, *supra;* St. Louis S. W. Ry. Co. v. Hynson, *supra;* Gulf, C. & S. F. Ry. Co. v. Williams, 72 Texas, 159, 12 S. W., 172; Missouri Pac. Ry. Co. v. Somers, 78 Texas, 439; Roy v. Hodge, 66 Atl., 123; 1 Labatt on Master and Servant, pp. 669, 1162. The facts here show that the appellee was an experienced lineman, having been engaged in the business nine years, and had worked in other departments of the telephone service. There is nothing to indicate that he did not have equal knowledge with that of any other employe in the service of the telephone company concerning the entire situation which confronted him on this particular occasion, and of the dangers that were likely to result from it. He saw the condition of the wires before he undertook to ascend the pole. If he did not at that time observe that the city wire was in actual contact with the iron step over which he had to pass, he undoubtedly did see that it was in such close proximity that contact was possible and even highly probable. This was a circumstance sufficient to put him upon notice of that situation. He must have realized, then, according to his own admissions, that the situation was dangerous for one attempting to climb the pole to the telephone wires above; but, as he says, he was willing to take the chances, believing it safe because he had seen another some time before that pass through the same network of wires in safety. As he ascended the pole and came nearer the charged wire on the step there was nothing except his own indifference that prevented him from observing the actual situation— that the wire was in contact with the step. He says he did not; but that alone will not absolve him from the duty of using his senses to discover what must have been in plain view. Railway Co. v. Hynson, *supra.* If he did see it, or if his situation with reference to it was such that he could have seen it had he taken even ordinary precaution for his own protection, he can not now excuse himself because he did not suspect the danger which he encountered. It was the contact of the wire with the step for which the telephone company in this instance is sought to be held responsible, and not for the unexpected current of electricity in the unused city wire. As to the presence of electricity in the wire, the servant had equal facilities with the master for knowing. In the Bradford case above referred to the court said: "If the master and the servant stand upon an equal footing with respect to knowledge of the danger, then in case of an accident as a result of the danger the master is exonerated." Here the appellee testified that he knew a wire was liable to fall on the city's wire and communicate to it a current of electricity. If it was negligence on the part of the telephone company not to foresee and provide against such accidents as did in this case occur, it was also a lack of ordinary prudence on the part of the appellee, when he knew of the situation, not

to anticipate the same results. We have discussed the question of knowledge on the part of the servant in this case upon the assumption that the appellant telephone company was guilty of the negligence charged, the finding of the jury being in favor of the appellee upon that issue. The principles of law considered and applied are those which govern the relative duties and rights of the master and servant under those conditions where the servant owes no duty to inspect for the purpose of ascertaining whether or not the place in which he is required to labor is safe, beyond that which is imposed by the dictates of ordinary prudence. These are not applicable where, under the contract of employment, or the peculiar character of the service to be performed, the servant assumes, in whole or in part, the duty of inspection, either for his own safety alone or for the benefit of the master. When this is the condition under which he works he can not rely wholly upon the assumption that the master has provided him a safe place; it becomes a part of his duty to see that it is safe. 1 Labatt on Master and Servant, section 414. We think the testimony of the appellee justifies the conclusion that by the terms of his employment he assumed to some extent, at least, the duty of ascertaining for himself if the place in which he was required to work was safe for that purpose. He says that it was his duty, and his alone, to see that he had a safe place in which to work when he went out to perform that class of labor. If so, it is difficult to imagine a situation that would come more completely within the range of those of which he was expected to take notice than that here shown to have existed. It is but natural and reasonable to expect that a lineman, having to work in positions above the ground difficult of access and removed from the ordinary opportunities for inspection, should be expected to rely less upon the presumption that the master had provided him a safe place, and more upon his own power and opportunities for observation. Flood v. Western U. Tel. Co., 131 N. Y., 603, 30 N. E., 196; McGorty v. Southern N. E. Tel. Co., 69 Conn., 635, 61 Amer. St. Rep., 62; Sias v. Consolidated Light. Co., 73 Vt., 35, 50 Atl., 554.

We think the evidence very conclusively shows that the appellee was under a greater duty to look out for his own safety in the places he was called upon to work, than that which generally rests upon the servant. Whether the act of permitting the electric light wire of the city to remain in contact with the step be regarded as negligence on the part of the telephone company or not, we think it was a situation of which the appellee under the circumstances assumed the risk. He either knew or should have known where he was placing his hands, and the wires with which he was likely to come in contact. Such a precaution was not only imposed by what he says was his duty, to see that the place in which he was to work was safe, but by ordinary prudence as well.

Without passing upon any of the other assignments of error, we think that as to the appellant Southwestern Telegraph & Telephone Company this case should be reversed and judgment here rendered in its favor. The case is therefore ordered reversed and rendered.

ON MOTION FOR REHEARING.

In the motion for a rehearing counsel for appellee insist that we erred in holding that appellee assumed the risk of the dangers incident to coming in contact with the wire, even if the evidence is sufficient to show that he knew the situation of the wires before and at the time he received the shock which caused him to fall. They contend that there is not sufficient evidence to support the conclusion that he knew of the presence of the danger which he encountered. We do not intend that the language used in the original opinion should be construed as going far enough to say that because the appellee knew of the condition of the wires he must necessarily have known of the lurking danger resulting from one of them being charged with a current of electricity. A knowledge of a situation does not always carry with it the knowledge of a danger. But it is not necessary to rest the conclusion we have reached, that the appellee knew of the danger likely to result from the abnormal condition which confronted him, upon a knowledge of the condition alone. He testified that electricians considered all wires with which they came in contact as charged, and dealt with them accordingly. He further says that he regarded the situation as dangerous, and swung out of the way of the wire for the purpose of avoiding the danger. He did not purposely come in contact with it, but did so accidentally and without observing its exact location on the iron step. Again, it is clear from his testimony that he would not have received the shock had he not at the time he placed his hand upon the iron step also put his other hand in contact with a messenger wire which he knew to be grounded. He was an experienced lineman and knew all the dangers incident to coming in contact with charged wires, was fully acquainted with the power and dangers of the electric current. The only fact about this situation of which he can be heard to plead ignorance is that the wire with which he came in contact at the time carried a current of electricity; but this, we think, becomes unavailable in view of his admission of the rule recognized and observed by his class of workmen, to treat all such wires as charged, and that at the time he swung himself around to the south side of the pole he was then undertaking to avoid contact with this wire for that very reason. It must be borne in mind that this current which caused his shock was not due to any negligence or conduct on the part of the appellant telephone company, or from any cause over which it had control. The conditions which produced it were as much within the knowledge of the appellee as that of the appellant company. Where the servant has equal knowledge with the master of the dangers incident to his work, he takes the risk upon himself if he goes on with it. Galveston, H. & S. A. Ry. Co. v. Lempe, 59 Texas, 19. In the case cited the court said: "There are some circumstances which will vary these rules, or rather create exceptions to them, but the present case is not brought within any of such exceptions. One of these is where the defects in the machinery or the premises about which the servant is employed are obvious, but the danger is not apparent. In such cases the master is held liable because the master should have taken steps to ascertain whether the defects render them unsafe. Wood on Master &

Servant, section 336. Of this character are all cases where there is some fault in machinery, or of a track of a railroad, which is as obvious to the servant as to the master, but from which, from want of experience or knowledge on the part of the former, he can not determine that the defect will be productive of danger to him. He may know that certain appliances usually connected with an engine are lacking, or that some of the rails of the track are warped or out of place, yet if he did not know, or could not reasonably have known, that in the one case there was imminent peril of an explosion, and in the other of the cars being thrown from the track, he could recover if injured by such accidents. On the other hand, if he knew, or should reasonably have known, that such defects would necessarily subject him to risk from such occurrences, he has no cause of action against his master. Id., section 355, and cases cited.

"The difference is between going into the service or continuing in it, *'knowing* that the instrumentalities employed are unsafe and dangerous,' and knowing that defects exist, but not that they necessarily render the employment of a perilous character. It is sought by appellee's counsel to bring this case within the above exception, and to that end he cited several reported cases; but with the above distinction in view, all the authorities cited by him are easily explained, and rendered consistent with the law as announced in this opinion."

Here the appellee knew of the condition of the wires and their situation with reference to the pole, and knew that the wire which caused his shock belonged to the city, and the purposes for which it was employed; and he will also be presumed to know as much about the fact of the accident that caused the current in this instance, or the probability of such occurring, as did the telephone company, his employer. He must have known also that while the city wires were generally dead during the daytime, they might not be so under any and all circumstances, and further, that where wires belonging to other companies crossed the city's wires just such accidents as did occur were likely to happen. There was no failure to perform any duty due from the master to the servant in this instance of which the appellee did not have full knowledge. He therefore stood in the attitude of knowing the negligence of the master, and had equal facilities with the latter of knowing all the dangers that would necessarily result from that situation. The motion for a rehearing is therefore overruled.

There is also a motion filed in this case asking that we reform and affirm the judgment of the trial court for the full sum of $4,000 against the Fort Worth Light & Power Company, one of the defendants below. The verdict rendered by the jury in the trial court was as follows: "We, the jury, find for the plaintiff, John Moore, judgment in the sum of four thousand dollars; three thousand dollars against the Southwestern Telegraph & Telephone Company, and one thousand dollars against the Fort Worth Light & Power Company; and we find in favor of the defendant, City of Fort Worth." Upon this verdict judgment was rendered for the plaintiff as follows: "It is therefore ordered and adjudged that said verdict be in all things approved and made the basis of judgment herein, and that the plaintiff, John Moore, is entitled to recover damages and does hereby recover on account of

his suit against the Southwestern Telegraph & Telephone Company and the Fort Worth Light & Power Company, defendants, in the aggregate sum of four thousand dollars, of which amount three thousand dollars shall be recovered against the Southwestern Telegraph & Telephone Company, and one thousand dollars against the Fort Worth Light & Power Company." The light and power company perfected its appeal and filed assignments of error in the court below, but filed no brief in this court. It is stated in this motion that the light and power company had an agreement by which its appeal was to be considered as being presented in the brief of the telephone company, but no such agreement was filed in this court nor were there any allusions to such made until after the decision of the case. It does not appear that the appellee made any effort in the court below to have the form of the judgment corrected and rendered as he seeks to have done in this court, nor is there any complaint by him in the record in any form of the judgment rendered. On the contrary, he appeared in this court by brief, and also in oral argument by his attorney, and asked for an affirmance of the judgment as rendered. If this judgment has the legal effect of authorizing execution to issue against the defendants jointly and severally for the full amount of the damages which the jury found the appellee entitled to recover, then any action upon our part is rendered wholly unnecessary. The appellee, however, has elected to treat it as restricting his right of recovery against each of the defendants according to the apportionment which the court undertook to make in following the verdict of the jury. Upon a verdict such as that here returned we think the plaintiff in the suit had the right to a judgment against both defendants jointly and severally for the entire damages awarded. San Antonio & A. P. Ry. Co. v. Bowles, 88 Texas, 640, 32 S. W., 880; San Marcos Electric Light & Power Co. v. Compton, 48 Texas Civ. App., 586, 107 S. W., 1153. The question here presented is not whether the judgment should have been so rendered by the trial court, but whether at this stage of the proceedings this court has the right to reform and so render it. Had cross-assignments of error been presented by the appellee calling in question the correctness of the form of the judgment rendered, or the action of the court in refusing to reform and enter a joint judgment against both of the defendants jointly for the entire sum, we would then have been clothed with all the authority necessary to pass upon the question; but this was not done, and the question is for the first time raised by this motion made after the case on appeal has been decided and during the pendency of the motion for rehearing.

The only errors which this court can review are those presented by appropriate assignments or cross-assignments, or such as appear upon the face of the record. Revised Civil Statutes, article 1014; Applebaum v. Bass, 113 S. W., 174, and cases cited. It has also been held that a codefendant can not assign error unless he also appealed. Anderson v. Silliman, 92 Texas, 560, 50 S. W., 576. A party not appealing can not have a judgment amended. Succession of Thomas, 114 La., 695, 38 So., 519; Ware v. Couvillion, 112 La., 43, 36 So., 220. The right to consider and correct fundamental errors, or such as appear upon the face of the record, is restricted to those only which

affect the rights of the party who has appealed; all others are presumed to be satisfied with the judgment as rendered. The Supreme Court has the same right to consider errors appearing upon the face of the record as have the Courts of Civil Appeals. Texas Brewing Co. v. Templeton, 90 Texas, 277, 38 S. W., 27. Yet in the Bowles case above referred to, where that court was called upon to review a judgment presenting a similar situation, it was said: "The correctness of the judgment of the Court of Civil Appeals in awarding judgment against the defendants separately for five thousand dollars each is not presented to this court by any assignment of error, and therefore we are not called upon to notice that error in the judgment further than to consider it with reference to the question of awarding the costs." It has been held that where a verdict is excessive and the question is for the first time raised upon appeal, not having been called to the attention of the trial court, the error will be considered as having been waived. Petri v. First Nat'l Bank, 83 Texas, 424, 18 S. W., 752; Simmons v. Rhodes, 27 S. W., 903. The Fort Worth Light & Power Company, against which it is sought to have this judgment here rendered for an additional amount of $3,000, has not prosecuted in this court the appeal which it perfected, and it may be that this failure was due to the fact that it was content with the judgment rendered against it and relied upon the conduct of the appellee as a waiver of any further claim against it for damages. We do not think this court has the right to do more than to affirm the judgment as rendered against the Fort Worth Light & Power Company, which is accordingly done. In all other respects the motion is overruled.

*Reversed and rendered for appellant Southwestern T. & T. Co.*