HUTCHERSON et al. v. AMARILLO ST. RY. CO. (No. 709.)

(Court of Civil Appeals of Texas. Amarillo. Jan. 25, 1915. On Motion for Rehearing, April 10, 1915. Rehearing Denied, May 8, 1915.)

1. MASTER AND SERVANT ☞209 — INJURIES TO SERVANT—ASSUMPTION OF RISK.

A servant who worked on a merry-go-round which had certain uncovered cogwheels, in which he was caught, assumed the risk of injury from such cogs, since an employé must avoid all known and obvious defects and perils and such as he must have discovered in the discharge of his duties, although the defects and dangers may arise from defective tools and machinery.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 552, 553; Dec. Dig. ☞ 209.]

2. MASTER AND SERVANT ☞209—INJURY TO SERVANT—ASSUMPTION OF RISK—DEFECTIVE SWITCH.

Where the deceased servant in the discharge of his duties of running a merry-go-round must necessarily have acquired knowledge that the controlling switch was defective, in that gravity alone might close the circuit, he assumed the risk of injury through any such chance closing.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 552, 553; Dec. Dig. ☞ 209.]

3. MASTER AND SERVANT ☞276—INJURY TO SERVANT—PROXIMATE CAUSE—FAILURE TO SUPPLY SAFETY DEVICE — SUFFICIENCY OF EVIDENCE.

In an action by a widow for death of her husband, killed on a merry-go-round in the course of his employment, evidence held insufficient to show that the failure of the employer to supply a certain safety device was the proximate cause of the accident.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 950–952, 954, 959, 970, 976; Dec. Dig. ☞276.]

4. DEATH ☞58—DUE CARE — PRESUMPTION.

Where there are no witnesses of an accident whereby a servant is killed, the mere fact of the accident raises a presumption of negligence neither against the servant nor the master; but the presumption will be indulged that the servant exercised due care, especially when last seen he was then acting with due care and within the scope of his employment.

[Ed. Note.—For other cases, see Death, Cent. Dig. §§ 75–78; Dec. Dig. ☞58.]

On Motion for Rehearing.

5. MASTER AND SERVANT ☞217—INJURY TO SERVANT—ASSUMPTION OF RISK—DEFECTIVE SWITCH.

Where the electric switch controlling the machinery of a merry-go-round was so loose that gravity would close the circuit unaided, negligence could not be predicated upon the employer's failure to equip such switch with a spring which would prevent the closing, since the decedent used such switch constantly in his work of operating the machine, while it would have been a simple matter for him to have rigged some device to secure such switch when open.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574–600; Dec. Dig. ☞ 217.]

6. MASTER AND SERVANT ☞129—INJURY TO SERVANT—DEFECTIVE MACHINERY.

Where plaintiff's husband was killed on a merry-go-round in the scope of his employment, defendant's failure to furnish certain lock nuts,

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

cotter keys, and buckle yokes, alleged as negligence, was not such, since the only effect of such devices would have been to steady the machine, while the only probable cause of the accident was its starting through the action of gravitation on an electric switch, so that the jarring effect, which the missing devices might have prevented, could not have taken place until the mischief, the starting of the machine, was done.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 257–263; Dec. Dig. ☞ 129.]

Error from District Court, Potter County; Jas. N. Browning, Judge.

Action by Mrs. Annie Hutcherson and others against the Amarillo Street Railway Company. Judgment for defendant, and plaintiffs bring error. Affirmed on rehearing.

L. C. Barrett and Jones & Miller, all of Amarillo, and J. L. Penry, of Dallas, for plaintiffs in error. Turner & Rollins, of Amarillo, for defendant in error.

HENDRICKS, J. On May 19, 1913, Herschell Hutcherson, while in the employ of the Amarillo Street Railway Company, engaged in working upon a merry-go-round, used as an amusement feature by said company at Glenwood Park, was caught in the machinery of said merry-go-round and killed. This suit was instituted by Annie Hutchcherson, the widow, for herself and four children, also joined by the father and mother of the deceased, alleging in several particulars defective machinery and an unsafe place in which to work. Quoting from defendant in error's brief:

"This merry-go-round was of the common type of such machines, constructed with an upright beam in the center, 12 or 14 inches square, upon which rested the extended arms, like the rods of an umbrella, revolving around this post and at a heighth of 8 or 10 feet. On each of these arms was an iron rod * * * from which suspended the hobby horses and carriages in which the passengers rode while the machine was revolving. These iron rods had an oscillating movement, so that the horses moved up and down as the machine revolved. Extending up this center beam or post was a ladder, so that the upper part of the machine * * * could be reached while the machine was standing still. * * * Attached to these crossarms underneath was a large cogwheel about 10 feet in diameter, the cogs fitting into those of a small wheel attached to an upright shaft, so that when the power was turned on and this shaft revolved, it moved these arms on which these horses and carriages rested and caused them to revolve, as the cogwheels fitting into each other were moved by the electric current."

In the park was a power house in which was generated the electricity operating the merry-go-round, and a "figure 8," which latter was moved by the same current of electricity, or a branch of the same, operating the merry-go-round. The deceased, Herschell Hutcherson, had been employed by the Street Railway Company, from three weeks to a month previous to the time of his death,

for the purpose of operating and managing said merry-go-round, as an amusement feature, and also to assist one Fletcher, a foreman at the park, in overhauling and repairing the same. Hutcherson was evidently killed by either falling, or having been jerked, into the cogwheels of the machinery, without any witnesses to the accident. When discovered on the floor of the merry-go-round, under the large wheel of the same, the crushed condition of his body, with considerable of his clothing hanging onto the cogwheel, suggest the cogs as the cause of his death. Three instrumentalities for the purpose of applying electricity and operating the machinery were attached to and used in connection with said merry-go-round: A single pole switch, by opening and closing the same, turned on and off the electrical current at the merry-go-round; a rheostat, for the purpose of regulating the current of electricity for the machinery and assisting in starting the same; a knife-blade fuse of 18 amperes, which, when inserted in its proper place, completed the connection and contributed to the operation of said machinery. Previously the current of electricity, of course, was required to be turned in at the power house upon the line, and in starting the machinery the switch was closed, the rheostat was moved, regulating the proper amount of current to start the load, and in connection with the knife-blade switch in its accustomed place, the merry-go-round revolved. Plaintiffs in error specifically allege that said merry-go-round should have been equipped with an overload relay, or a circuit-breaking switch, which would have automatically broken the current of electricity whenever an overload in weight existed upon said machine, and would have caused the same to have instantly stopped; that the bolts and shafts on the merry-go-round should have been equipped with lock nuts and cotter keys, as a preventative against jar and oscillation; that the cogs should have been covered; that the large wheel, designated as the master wheel, should have been floored or latticed, and that the switch lever, by means of which the merry-go-round was started, was negligently constructed and allowed to remain in such a loose condition that any jar would throw the same and complete the connection, thereby starting the machinery; further alleging that Hutcherson was unskilled in this character of work, and was unacquainted with the defects in connection with the machinery, and did not appreciate the dangers in connection therewith, and that defendant violated its duty in failing to warn deceased of such defects and dangers; plaintiffs in error further alleging that a vice principal of the defendant, with authority to employ and discharge, negligently caused or permitted the current of electricity to be turned on at a time when

the deceased was working about the machinery, and when the latter was in such a position that he would be thrown and caught in the machinery and killed. At the close of the testimony the trial court peremptorily instructed a verdict in favor of the Street Railway Company, and the matter of the sufficiency of the testimony, with reference to the defects in the machinery, and the negligence of the master, in connection with the defenses of assumed risk and contributory negligence of the deceased, is involved in various phases.

[1] Of course it is the rule that the employer can only expect that the employé will be on the alert to avoid all known and obvious defects and perils, or such the knowledge of which he would have necessarily acquired in the discharge of his duties; and this applies though the defects and dangers may arise from defective tools and machinery. Ordinarily the employé does not owe the duty of inspection; he has the right to assume the fulfillment of the master's duty, and generally he is chargeable only with obvious imperfections, or those he should presumptively know about the place or with the instrumentality. The knowledge of defects and the comprehended danger with reference to unguarded machinery when the servant enters the service, though the master may be negligent in that respect, becomes one of the assumed incidents of the service so far as the servant is concerned. Klutts v. Gibson Bros., 37 Tex. Civ. App. 216, 83 S. W. 404; Ladonia Cotton Oil Co. v. Shaw, 27 Tex. Civ. App. 65, 65 S. W. 693; Mt. Marion Coal Mining Co. v. Ella Holt, 54 Tex. Civ. App. 413, 118 S. W. 825, writ of error denied by Supreme Court; Railway Co. v. Peden, 32 Tex. Civ. App. 315, 74 S. W. 932, writ of error denied by Supreme Court; Schroeder v. Michigan Car Co.. 56 Mich. 132, 22 N. W. 220; The Maharajah, 49 Fed. 111, 1 C. C. A. 181; Kyner v. Portland Gold Mining Co., 184 Fed. 46, 106 C. C. A. 245. Circuit Judge Van Devanter said, in the last case cited:

"As respects the first specification of negligence, it conclusively appeared that the absence of a guard about the drum * * * was so patent as to be readily observed, that the enhanced danger arising therefrom was so obvious that its appreciation by the plaintiff was unavoidable, in view of his years, intelligence, and experience, and that under those conditions he voluntarily continued to work about the drum and cable. So, even if the absence of a guard was a negligent omission on the part of the defendant, the court was bound to rule, as a matter of law, that the plaintiff assumed the risk incident thereto." Snipes v. Bomar Cotton Oil Co. (Sup.) 161 S. W. 2.

[2] As to the defective switch, the brother of the deceased, who qualified as an electrical machinist, and who saw the merry-go-round, its machinery for propulsion, and the condition of same the following day succeeding the accident, testified:

"I examined this switch and its condition. * * * There was only one switch, which was a single pole switch. It only would disconnect one side of the line and in connection with that there was a starting box (the rheostat). You could handle this switch when you closed the circuit, and throw in the starting box; throw in the resistance, and the machine would start. The starting box was arranged so gravitation would very nearly close it [the switch]. It stood up in such a position that the handle of the switch stood in that position, this way [indicating], and this point closed it, and that point opened it; the switch was very nearly balanced, and any jar would close the circuit on this switch and start the machine."

He also testified:

"* * * They used a starting box there and had a single pole switch that was very nearly balanced on its pivot. If I remember, it is in the shape as I saw it first. Anyhow, I believe it was up, and any vibration or anything like that would cause the switch to drop and close the circuit."

Gideon, one of the plaintiff's witnesses, said the deceased had been there about a month: "His duty was to run the merry-go-round and manage the same." The testimony showed that deceased had operated the same.

Eliminating from the mind the popular conception of the mystery of applied electricity, a construction of the single pole switch and the operation of same for the purpose of making the electrical connection and closing the circuit is a very simple affair, as we infer from this record; turned one way the current was off, and moved the opposite direction the current was on. Plaintiffs in error allege that:

"The switch, by means of which the said merry-go-round was started and stopped, when the current was on, was negligently constructed, and was allowed to become and remain in such a condition that the least jar or touch would throw the same and cause the machinery to start; said switch had become so loose that when jarred it would fall into such a position that the merry-go-round would start to running when the machinery was jolted or jarred in any way."

If this switch "was very nearly balanced on its pivot, * * * and was so arranged that gravitation would very nearly close it," on account of the handle of the switch being in such position as to produce that effect, as testified to by Hutcherson, the expert, its condition could be comprehended by a man of ordinary observation and intelligence. The deceased, in the discharge of his duties, must necessarily have acquired a knowledge of such condition of the switch, if defective, as stated by this witness, and knew that if it was so loose that the slightest jar might cause it to drop to the proper point for the purpose of making the connection—its defective condition was obvious. Where a servant is in charge of machinery he cannot rely wholly upon the assumption that the master has provided him a safe place, and to some extent it becomes a part of his duty to see that it is safe. Ft. Worth Light & Power Co. v. Moore, 55 Tex. Civ. App. 165, 118 S. W. 831.

The primary duty to know whether a piece of timber which has been used for a consid-

erable time as a lever for raising the door of a furnace has become unfit for that purpose rests upon the servant who is in immediate charge of the furnace, and not upon any superior officer. Allen v. G. W. & F. Smith Iron Co., 160 Mass. 557, 36 N. E. 581.

The employer is not responsible for any injury to a servant caused by his fall from a platform on account of being defectively attached to a building, when the servant, a mature workman, had attached the platform and had not asked or received any instructions from the master, and had a full opportunity to make such an examination as would indicate the safest method of holding up the platform. Arnold v. Eastman Frt. Car Heater Co., 176 Mass. 135, 57 N. E. 209.

The Supreme Court said in the case of Railway Co. v. Williams, 72 Tex. 164, 12 S. W. 174:

"His experience [one using a hand car] would be of negative value if it left him unable to recognize in the machinery he uses, the qualities of weight, and its effects as an instrument as greater or less of it. If the car was too light, the plaintiff had the means of knowing the fact, and he cannot complain that the ordinary laws of physics were not explained to him. That a light body is more easily deflected from its course than a heavy one should be known to every one handling machinery. Railway Co. v. Bradford, 66 Tex. 736 [2 S. W. 595, 59 Am. Rep. 639]."

The Commission of Appeals held that if the danger of the use of a machine is apparent and does not follow from a latent defect, and is easy to comprehend, and requiring but little skill or practice to operate it, an employé in the use of it will not be heard to complain that he was not informed of its construction or the danger of using it. Railway Co. v. McCarthy, 64 Tex. 636. Chief Justice Willie said (Railway Co. v. McNamara, 59 Tex. 258):

"Such knowledge might be presumed against a servant in reference to machinery or appliances which his particular line of duty required him to deal with and inspect. * * * A brakeman might be charged with knowledge of the manifest deficiencies and dangers of the particular bolts, buffers, or drawheads used by himself in coupling and uncoupling cars."

We also refer to Stroble v. Railway Co., 70 Iowa, 555, 31 N. W. 65, 59 Am. Rep. 456. Because Fletcher, though foreman of the men at the park, assisted in overhauling the machine, may not have ordered a remedying of the defect, or because it is not shown that he did not himself remedy the same, would not negative the acquisition of knowledge by the deceased of the condition; and the consequences which would follow if the switch dropped when the current was on the line, and if the switch was hung on its pivot in such a manner, and was so loose in that respect with reference to its position, that the slightest jar, assisted by gravitation, would cause it to fall and make the connection and thereby start the machinery, we assume that the deceased, as a man of ordinary intelligence, must have necessarily acquired that knowledge in the management and operation of the same in the discharge of his duties. The testimony of the brother upon this point was not of an expert nature; the condition was a matter of common knowledge which did not require knowledge of applied electricity to understand.

[3] Appellants also allege that the absence of an "overload relay" was a proximate cause of the injury. Hutcherson, the expert, testified that this machine should have been provided with such an appliance. We infer that this witness has reference to an appliance, where an overload in weight, and not an overload of electricity, would automatically stop the machine. He said:

"If a heavy load went into an overload relay, that is, any obstruction that would shut it down, it would shut down immediately. Just the minute the overload hits it, the magnet comes up into the coils and turns the magnet loose, and the lever throws to the position where the machine will not run. * * * My opinion is that any overload that you gave this machine—if a man my brother's size fell into that cog and the machinery was equipped with an overload relay, it would stop instantly. * * * When an extra load is placed on the machinery, that requires more power that automatically stops the machine. * * * The carry in the merry-go-round will carry its load with the velocity of the machine. * * * Then the overload could be set at the exact starting point of the swing."

He also testified that the overload should not exceed 5 per cent. of the horse power that carries the machine.

"* * * As to the difference in the weight of the machine with the horses full of passengers and the horses empty, I would have to know the weight of the passengers. I do not know."

This witness had previously said:

"As to how much overload it would require to stop the machine, it could be set at any safe position; that is, according to the operator's judgment."

If we correctly understand the adaptable purpose of the overload relay, applicable to the particular machinery, contended for by plaintiffs in error, this testimony is very unsatisfactory in reaching the point that the absence of same, as applied to a merry-go-round, and its use, is adequate as a proximate cause of the injury, or that the presence of such an appliance on this merry-go-round would have prevented it. We can understand where the weight to be moved is practically without variation; such an appliance may be used, and would become practical as a preventive of injury. The burden is upon the plaintiff to prove the particular negligence as an actuating cause of the injury. This record is silent as to the size of the machine, the number of horses and carriages used as an amusement feature, nor is there any testimony of the maximum weight, or any weight, to be provided for in the event such an instrument was used, except that it should be set at the exact starting point of the swing and should not exceed 5 per cent. of the horse power of the motor.

This man was killed when the horses and carriages were empty. We necessarily presume that "the exact starting point of the swing" would take more power if the machine were full of passengers than if empty. If we understand correctly the application of machinery, the movement of the lever of the rheostat regulates the current, and the resistance, in starting the load. We are not informed whether the difference in the weight of a load with the merry-go-round full and empty would be 1,000 or 20,000 pounds; we would guess it more than the former and less than the latter figure. As the witness says that the relay would have to be set "according to the operator's judgment," he evidently means that the operator would provide for some maximum weight that would be on the machine when operating it for amusement purposes; and, "when an extra load is placed on the machine that requires more power," it is then, if we grasp this testimony, that the excessive load "automatically stops the machine." This witness does testify that a man of the size of his brother, in going into the machine after the relay is set, providing for some load, according to the operator's judgment, would stop said machine; but he does not testify that, if set at such a point providing for such a weight that if a human body were caught in the cogs, with the minimum load, caused by such an obstruction, would take more power than that provided for by the relay when set for a maximum weight. There is nothing to show that if the "overload" were set to move some maximum weight "at the point of the swing," by the movement of the minimum weight (when the merry-go-round was empty), plus the weight resulting from an obstruction of the human body, the injury could have been prevented. Equivalently expressed, there is nothing to show that the additional weight would more than absorb the whole power when the "overload" relay would be set at the maximum. This witness says that it should not exceed 5 per cent. of the horse power, whatever the power may be, but, if so set, his testimony does not tend to show that if the merry-go-round were empty, the deceased would not have been killed by the maximum power so provided. Under the conditions, we think the testimony is valueless as proof of proximate cause.

Plaintiffs in error, under their fourth assignment of error, present the proposition that:

"The pleadings and evidence in this case raising the issue as to whether or not the switch on the merry-go-round should have been equipped with a spring or safety device, it was error for the trial court to ignore such issue."

The expert witness, Hutcherson, testified, in substance, that there was not any spring on the switch to hold it off when not in operation, and that without a spring, when the power was thrown on at the power house, the switch would have a tendency to close the

circuit, which would not have occurred had there been a spring to hold it.

"The spring operates, with a knife-blade switch. When you close the switch the force of the knife blade holds it in, and when you open it the spring holds it back, so that gravitation or vibration would not close it. With the spring on, if you turn the power off the spring would draw it loose. This one was not equipped so that if the power was turned off at the power house it would go off automatically. * * * If the switch were left open, if there was no spring in it, and it was left so the machinery would not run, and the full power at the power house was thrown on, there would be a tendency for it to close. It could not do that if there was a spring to hold it."

As a further explanation he said:

"If you first had the machine running with the power turned on at the power house, and the merry-go-round had been equipped with a spring switch and the current was then turned off at the power house, and the switch came off and then you threw the power on again at the power house, that would not start the merry-go-round. In order to start the merry-go-round, you would have to pull the switch in again."

We think the testimony is sufficient, regarding it as a jury question, to place the deceased in the performance of his work, in the upper part of the merry-go-round, immediately previous to his death. Hutcherson and Fletcher, the same day of the former's death, were engaged in repairing the machinery.

[4] Gideon, one of the employés, testified that when they went to the merry-go-round it was moving; Hutcherson was unconscious and lying under the flywheel of the machinery, with his clothes practically stripped from his body. Some of his clothing was hanging "in and about the machinery near the cogwheel, and [some] scattered on the floor of the merry-go-round." He further said that he saw at this time "a tool box and a monkey wrench near the place where Hutcherson was caught in the cogwheel. There were several heavy pieces of timber as steadying for the merry-go-round and a tool box and a monkey wrench were laying on one of these planks." He said:

"I am not positive as to whether the tool box was portable or attached to the machinery of the merry-go-round. The tool box and monkey wrench were seen on the top of the merry-go-round near the cogwheel."

The accident occurred about 6 p. m., and Fletcher, Hutcherson's co-worker in the repair of the machine, said that when he returned to work later in the evening, he found wrenches on the floor of the merry-go-round. A loose nut was noted near the place where it is inferred that the deceased may have been working.

Labatt, in his work on Master & Servant (Last Ed.) vol. 4, § 1609, p. 4912, announces:

"It is a principle frequently asserted that if a servant is killed and there are no eyewitnesses of the accident, the presumption will be indulged that he was in the exercise of due care, especially if, when last seen, he was acting with due care and within the scope of his duties. This principle inures to the benefit of the serv-

ant, even in those jurisdictions in which the burden of proof is upon the plaintiff, the presumption arising from the instinct of self-preservation being sufficient to sustain the burden; in fact it is in such jurisdictions only that this principle finds its effective application."

The numerous notes and citations of the author fully exemplify the rule in all of its phases.

The law in fact raises no presumption of negligence against either the plaintiff or the defendant from the mere fact of accident or injury. Railway Co. v. Shieder, 88 Tex. 152, 30 S. W. 902, 28 L. R. A. 538.

If the jury could infer as a fact that the deceased was in the position above the machinery of the merry-go-round, then to assume that he arrived there by climbing upon the moving horses and ascending certain rods is to infer conduct, which is a disputable question for the jury, notwithstanding Fletcher testified that the deceased upon Friday previously got into the upper part of said machinery while the merry-go-round was in motion. As stated, there was a ladder, which, however, was hazardous for the purpose of ascension when the machinery was in motion. It could be found as a fact that this machinery started, and that the merry-go-round was put in motion, at a time when the deceased was in the performance of his work, in the upper part of· the merry-go-round; that he exercised ordinary care in getting there. It may be, as defendant in error contends, that it is not inferable that because Wyatt, the superintendent of the park, carried a key to the power house, and because Fletcher carried the other key to said power house, which was usually locked, the former negligently turned on the power and started the machinery. Fletcher does say that about an hour before the accident, when he left the park for Amarillo, the power was not on at the power house, and that said power house was usually locked; but we think it is a remote conclusion that Wyatt, if you could ever concede that because he carried the other key to the power house and actually turned on the power—that he turned on the same in a negligent manner. The fact remains, of course, that the power was turned on by some one, and defendant in error would have us deduce that because Hutcherson, the deceased, was seen at or near the theater building, situated between the merry-go-round and the power house, a short time before the accident, he caused Wyatt to turn on the power; and defendant in error may also argue that we must equally infer that Hutcherson, the deceased, had closed the switch at the merry-go-round, retaining a closed circuit, and wherever he may have been situated at the time of the accident, when the power went into the machinery at the merry-go-round, he therefore assumed the risk or was guilty of contributory negligence. We think the jury would have the right to say that the switch at this time was hanging off, and turned off by Hutcher-

son the last time previous to the accident, when the machinery had been operated—the machinery ordinarily is not stopped by keeping on the switch—it is done by turning it off. The jury could readily infer that Hutcherson did not stop the machinery by taking out the knife-blade switch the last time the machinery was operated previous to said accident. If Hutcherson were in the upper part of the machinery, which situation the jury could infer, said situation is to some extent in antagonism to contributory negligence as to his previous handling of the switch; and, with no witnesses to the accident, unless there is evidence upon which to infer his conduct, the presumption is that the deceased, at the time of the injury, and immediately previous thereto, was exercising ordinary care. It could not be conclusively presumed, as a judicial question, that the deceased left the switch on, and that the current was closed when the merry-go-round was stopped and used immediately previous to the accident and then ordered that the power be turned on at the power house and then ascended the ladder, placing himself in the upper part of the machinery with the switch on, and at a time when he was expecting to work in that position. If the jury deduced that he was above, when the machinery started— whoever turned on the power—they could also infer that the switch dropped (that tendency being testified to by his brother), and that the circuit was then closed, and that the presence of the spring, as testified to by Hutcherson, the expert, could have prevented the injury. The last expression by the Supreme Court of this state, adopted from the Supreme Court of the United States, as to the question of negligence, when it is for the jury, and when it is a judicial question for the court, is as follows:  ·

"When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the courts." Cartwright v. Canode (Sup.) 171 S. W. 698.

We are also inclined to the view that this is a cause provable by circumstantial evidence, as a jury question, and not one as a judicial question, which raised other causes more or less probable, or as one of presumption upon presumption, that would require the court, and not the jury, to pass upon the matter. Railway Co. v. Boone, 105 Tex. 188, 146 S. W. 533; Myers v. Pittsburgh Coal Co., 233 U. S. 184, 34 Sup. Ct. 560, 58 L. Ed. 906; J. M. Guffey Petroleum Co. v. Dinwiddie, 168 S. W. 439.

Superficially, it may be said that if Hutcherson, the deceased, knew that the switch was in the condition, and defective, and would have a tendency to drop, as his brother testified, and that therefore because he was guilty ·of assumed risk as to the particular

matter, that the absence of a spring upon the switch would not assist the case. A man may know of a defective condition and its tendency to do a certain thing, but may or may not be acquainted with the mechanical device as a jury question, or may or may not have knowledge of its adaptability which, if placed upon machinery, would prevent the accident; of course a man who sees unguarded machinery necessarily knows that it should and could be safeguarded by banister or covering and assumes the risk—it is obvious.

Without going into distinctions, neither do we think that because we hold that Hutcherson assumed the risk as to a particular condition of the defective switch, by virtue of his necessary knowledge of the same, he was conclusively guilty of contributory negligence, and that such would preclude the absence of the spring switch as a ground of negligence. We think that the absence of a spring upon the switch is a subject which the jury would have the right to take into consideration as a preventative of the injury, and that Hutcherson's testimony as to this matter is to some extent of an expert nature, and exhibits the tendency of the machinery, which, with the absence of said spring switch, in connection with other conditions, would make this question one for reasonable minds to debate as a proximate cause of said accident, and for which the master may be liable; and upon this issue, and this issue only, this cause is reversed and remanded.

### On Motion for Rehearing.

[5] We think this court erred in reversing this case, referable to the allegations and the testimony as to the absence of a spring on the single pole switch as an element of negligence. The testimony was that this switch was in such a position as that "any jar," or "any vibration" would cause the same to drop and close the circuit. If the switch was "very nearly balanced" and was "arranged so that gravitation would very nearly close it," as testified to by Hutcherson, the witness, the deceased, who was employed as manager to operate the machine, and had operated the same in such capacity, must necessarily have known the defective condition of said switch, and knew its obvious tendency, from any "jar" or "vibration," to drop and close the circuit, thereby starting the machinery, as held in the original opinion. It is hard for us to determine the character of the spring as a device in connection with the switch used to prevent the tendency mentioned; but the witness said it was one "when you open it the spring holds it back so that gravitation or vibration would not close it," and that "this one was not so equipped that if the power was turned off at the power house it would go off automatically." The Supreme Court of Massachusetts, in the case of Toomey v. Donovan, 158 Mass. 232, 33 N. E. 398, said:

"The remaining question relates to the admissibility of certain testimony offered by the plaintiff, tending to show that for a long time prior to the accident automatic guards had been in use upon such machines for the purpose of preventing the head block from coming down in case there was any defect in the machine, and that the defendants knew of such guards, and the plaintiff did not know of them. This testimony was excluded by the court, and we think rightly. For a part of three years prior to the accident, the plaintiff had worked upon a machine like that upon which he was injured. He was 25 years old at the time of the accident, and, for aught that appears, was of ordinary intelligence. He knew that there was no guard on the machine, and no way of preventing the head from coming down if the machine was out of order. The fact that there was no guard was an obvious one; and in working on the machine, he must be held to have assumed the risk resulting from the absence of a guard. *Whether he did or did not know that automatic guards were in use on such machines was immaterial. He agreed to work on the machine as it was, and the defendants owed no duty to him to put on the guard.* Having assumed the risk of operating the machine without a guard, the plaintiff cannot now claim that one should have been put on."

Also, see, Klutts v. Gibson Bros., 37 Tex. Civ. App. 216, 83 S. W. 404; Chicago Veneer Co. v. Walden (Ky.) 82 S. W. 295.

It may be that it is a jury question whether the deceased could be charged with knowledge of a particular device, the absence of which is asserted as negligence of the master, and which is a matter that has troubled this court; but the deceased was employed to manage and operate the machine, and if we correctly apprehend the pole switch, any simple device, a string tied to a nail with a loop to go over the switch pole, would have prevented the tendency to drop.

[6] The plaintiff in error, in her motion for rehearing, assigned that we erred in holding that the deceased—

"assumed the risk from failure to equip said machinery with lock nuts, cotter keys, buckle yokes, and latticed floors, since in order for deceased to have assumed the risk it was necessary for him, not only to have known of such defects, but also for him to have apprehended the danger of such defects, and the evidence does not show conclusively that he either knew of the defects or appreciated the dangers thereof."

The latticed floors over the cogs or machinery we think we sufficiently disposed of in the main opinion as a ground of negligence permitting recovery, the absence of which the deceased assumed the risk. The other matters assigned we did not mention. As to the "lock nuts, cotter keys, and buckle yokes," alleged as negligence in the petition, in connection with the testimony, we have been unable to fully grasp as a proximate cause of the injury. With reference to such matters the only serviceable purpose we can see is that such a condition had a tendency to increase the "shaky" condition of the merry-go-round, thereby producing more "jar," "vibration," or oscillation. If so, unless some one was in the framework, or upon the machinery or against the same, producing a jar or shake creating the tendency

of the switch to drop, how the condition of said lock nuts or buckle yokes could have otherwise caused the same to have dropped we are unable to deduce; if the machinery had started, thereby increasing the jar or vibration, the plaintiff in error of course could not be assisted—the switch had already dropped. We are not assuming that plaintiff in error is arguing that the defective condition of said lock nuts or buckle yokes, or defective machinery otherwise, if either was the cause of Hutcherson going up into the merry-go-round, would constitute an efficient or proximate cause of his injury—such a doctrine is wholly untenable—but if the other contention is made, that the vibration is augmented by the loose condition of the machinery, plaintiff in error may be in this condition: When Hutcherson, the deceased, went into the upper part of the merry-go-round to work (where the evidence circumstantially as a jury question may place him) and in doing said work he shook the machinery in some manner with his body, and thereby caused the switch to drop, likewise there could be no recovery. Texas & Pacific Coal Co. v. Kowsikowsiki, 103 Tex. 173, 125 S. W. 3.

As to the assignment in plaintiffs' motion raising the question of another servant turning on the current, aside from the reasons given in the original opinion, Wyatt is not a vice principal. Lantry-Sharpe v. McCracken Co., 105 Tex. 407, 150 S. W. 1156.

Plaintiff in error's motion for rehearing is overruled, and defendant in error's motion is granted; and the judgment previously entered reversing this cause is set aside, and the judgment of the district court is affirmed.